**Nancy RIDING, Plaintiff,**

v.

**KAUFMANN'S DEPARTMENT STORE and May Department Stores Company, Defendants.**

No. CIV.A. 99–2035.

United States District Court, W.D. Pennsylvania.

Aug. 8, 2002.

April L. Boyer, James B. Lieber, Lieber & Hammer, Pittsburgh, PA, for plaintiff.

Philip J. Murray, III, Thorp, Reed & Armstrong, Pittsburgh, PA, Betty Thorne Tierney, May Department Stores, St. Louis, MO, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court is the motion for summary judgment by defendants, the Kaufmann's Department Store and May Department Stores Company (collectively referred to as "Kaufmann's"), seeking judgment in its favor on Nancy Riding's five-count complaint for damages, reinstatement and other legal and equitable relief for alleged gender and pregnancy discrimination, retaliation and constructive discharge under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and the Pennsylvania Human Relations Act ("PHRA"), Pa. Stat. Ann. tit. 43, §§ 951 et seq. Specifically, plaintiff claims she was discriminated against on the basis of gender and pregnancy on May 28, 1998, when she was demoted from salaried manager of the fashion studio of Kaufmann's advertising department to fashion photographer, an hourly position; in November, 1998, when she was demoted from fashion photographer to merchandise photographer, while on extended maternity leave; and that Kaufmann's retaliated against her for complaining about discrimination and hostile work environment on May 28, 1998 and in November, 1998, and, ultimately, constructively discharged her in December, 1998.

After careful consideration of defendants' motion for summary judgment, plaintiff's response thereto, the memoranda of law in support and in opposition, and the *extensive* deposition testimony, performance evaluations and other supporting documents and materials produced by the parties, the Court finds that plaintiff has failed to demonstrate the existence of genuine issues of material fact as to essential elements of each of her claims. The Court will grant summary judgment in favor of defendants, and dismiss the case.

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir.2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d Cir.2001) (citations omitted). An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a summary judgment motion, the court must "view the evidence ... through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir.2002), *quoting Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. 2505. When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). To meet its burden at this point, the non-moving party must present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989), *citing Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Instead, the non-moving party must point "to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir.1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir.1994).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to, draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. *Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir.2001); *Woodside*, 248 F.3d at 130; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir.1999). Further, the court must not engage in credibility determinations at the summary judgment stage. *Simpson*, 142 F.3d at 643 n. 3, *quoting Fuentes*, 32 F.3d at 762 n. 1.

**Undisputed Background Facts**

The parties have submitted Joint Stipulations of Fact ("J.S.") for trial which set forth the following undisputed facts. Plaintiff, Nancy Riding, is an experienced photographer who was hired by defendant May Department Stores Company, d/b/a Kaufmann's Department Store ("Kaufmann's") on or about May 26, 1992, to work in the photo studio of its advertising department in Pittsburgh. J.S., ¶¶ 1–9. Ms. Riding is married and has two children, her first being born in November 1995, when she took family medical leave for the birth, and her second on September 19, 1998. J.S., ¶¶ 13–14. Ms. Riding took family medical leave beginning in June 1998, in connection with the pregnancy of her second child. J.S., ¶ 16.

At relevant times, the hierarchy in Kaufmann's advertising department consisted of: Jerry Eccher, Senior Vice President of Advertising/Sales Promotions; Mary Ann Brown, Vice President Advertising; Ann Corbett, Vice President and Creative Director; Erika Kirwin, Division Vice President and Director of Special Promotions; and Joanne Pagnanelli, Vice President and Director of Fashion Merchandise. J.S., ¶ 10. Joanne Pagnanelli reported directly to Jerry Eccher, as did the other officers. J.S., ¶ 11. Ann Corbett replaced the previous Vice President and Creative Di-

rector, Barbara Mihopulos, in 1996. J.S., ¶ 12.

From May 1992 until May 1996, Ms. Riding worked as the studio manager/fashion photographer, in which capacity she managed both components of the photo studio, the fashion studio and the home studio, and also worked as a fashion photographer. J.S., ¶¶ 17–18. As studio manager/fashion photographer, plaintiff reported to the creative director (first Barbara Mihopolous, then Ann Corbett). J.S., ¶ 19.

Michael Kupniewski became assistant home studio manager in 1993. J.S., ¶ 20. In May 1996, Ms. Riding was relieved of responsibility for the home studio and her title changed to fashion studio manager/fashion photographer. J.S., ¶ 21. Also in May 1996, Edward "Rock" Machen became home studio manager at Kaufmann's; he reported directly to Joanne Pagnanelli, as did Ms. Riding. J.S., ¶¶ 22–23. On May 28, 1998, Mr. Machen was promoted to photo studio manager and Ms. Riding was informed she was being demoted, effective June 1, 1998. J.S., ¶¶ 24–25. "As a result of the demotion, Ms. Riding's responsibilities and title were changed and she became an hourly employee." J.S., ¶ 24.

On or around October 19, 1998, plaintiff sent a letter to a Steve Hersh in Human Resources, requesting information about the position to which she would be returning from her family medical leave. Mr. Hersh requested that Andrew Melissinos, also of Human Resources, respond to Ms. Riding's request. J.S. ¶ 26. Mr. Melissinos spoke with Ms. Riding on November 23, 1998, and informed plaintiff she would be returning as a "Merchandise Photographer." J.S., ¶ 27. Plaintiff found that change to her job title and her duties as a merchandise photographer unacceptable, and rejected this position in December, 1998. Plaintiff did not return to work for Kaufmann's.

Ms. Riding claims she was demoted by Kaufmann's in May 1998 from fashion studio manager to fashion photographer because of her pregnancy and/or her sex. Kaufmann's denies plaintiff was discriminated against in any way, and asserts it demoted Ms. Riding in May 1998 for legitimate, non-discriminatory reasons. Ms. Riding also claims she was further demoted in November 1998 from fashion photographer to merchandise photographer, and because of that intolerable demotion and other discriminatory conduct, was constructively discharged because of her pregnancy and/or her sex and/or in retaliation for having complained to Kaufmann's about pregnancy and sex discrimination. Kaufmann's denies it discriminated or retaliated against Ms. Riding in any way, and further asserts she was not demoted in November 1998 nor was she constructively discharged. Joint Stipulation With Regard to Brief Statement of Claims and Defenses for Use in Preliminary Instructions to Jury and With Regard to Expert Witnesses (Document No. 61), at 1–2.

**Disputed Background Scenario**

Practically every other fact and inference in this case is disputed, reflecting a *fundamental* difference of perception and opinion about Ms. Riding's employment history and performance as a manager at Kaufmann's.

According to Kaufmann's, almost from the beginning Nancy Riding was a "difficult employee who caused numerous personality conflicts with her colleagues and subordinates. As a result, she was a poor manager of the Studio." Defendants' Memorandum in Support of Summary Judgment, at 1. Kaufmann's claims Ms. Riding was condescending and negative toward colleagues and subordinates which created constant tension in the studios, and which resulted in several employees requesting transfers or leaving Kauf-

mann's. Although Kaufmann's never questioned Ms. Riding's photographic skills, which by all accounts were outstanding, it was always concerned with her perceived management deficiencies, as indicated in each of her annual evaluations from 1992 through 1997, and ultimately, it decided to relieve her of all managerial responsibilities in 1998, but without loss of pay or benefits. In fact, Ms. Riding was the highest paid salaried employee of the photo studio, and she remained the highest paid employee—salaried or hourly—even after her demotion in May, 1998, by about $15,000.

Ms. Riding's account of her employment history is radically different from Kaufmann's. According to plaintiff, not only was she an excellent photographer but also an outstanding manager whose projects were always timely and of high quality. While plaintiff does not contest that there were, from time to time, some conflicts between her and various co-workers and subordinates, and "creative tension" in the studios, she asserts that such tension is endemic when dealing with artistic persons, and claims Kaufmann's exaggerates the magnitude of the tension and personality conflicts that existed in the studio. Ms. Riding also claims other male managers had similar complaints lodged against them and personality clashes with employees and colleagues, but Kaufmann's never demoted them. Moreover, Ms. Riding asserts she experienced gender and pregnancy discrimination throughout her employment with Kaufmann's, recounting several incidents to support that claim, and she attributes her demotions and alleged constructive discharge in 1998 to discrimination on the basis of sex and pregnancy and retaliation for her complaints, not to Kaufmann's purported dissatisfaction with her managerial performance, which she claims is "pretext."

While perceptions of many of the specific events and incidents are inherently subjective (therefore the inferences derived therefrom are rarely either black or white), nevertheless, the Court finds Kaufmann's perception of plaintiff's employment history enjoys substantially greater support in the record than Ms. Riding's. Viewing the facts in the light most favorable to, and drawing all reasonable inferences and resolving all doubts in favor of, Ms. Riding, the nonmoving party, and without belaboring *every* factual dispute detailed in the parties' respective statements of material facts and memoranda, the Court will make additional summary judgment findings as it develops plaintiff's claims.

### The Burdens of Proof and Substantive Evidentiary Standards

Employment discrimination claims under the Title VII and the PHRA [1] can be established in one of two ways: (1) by direct evidence that the employer's decision was motivated by discrimination; or (2) by indirect evidence which creates an inference of discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

If plaintiff offers sufficient direct evidence of discrimination, the case is a "mixed motives" case wherein the burden of proof shifts to the employer, which must show that it would have made the same employment decision even absent the illegitimate discriminatory factor. *Simpson*, 142 F.3d at 644 n. 5, *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n. 12, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

---

1. Discrimination claims brought under the PHRA are analyzed under the same standards as their federal counterparts. *See Connors v.* *Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir.1998); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996) (Title VII, ADA, ADEA).

" 'Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact [in issue] without inference or presumption.' " ... However, "evidence is not direct where the trier of fact must infer the discrimination ... from an employer's remarks." *Torre v. Casio Inc.*, 42 F.3d 825, 829 (3d Cir.1994) (citations omitted). That is, direct evidence is overt or explicit evidence which directly reflects a discriminatory bias by a decision maker. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778, 782 (3d Cir.1994).

As the Court of Appeals for the Third Circuit most recently stated in *Anderson v. Consol. Rail Corp.*, 297 F.3d at 248:

In *Connors v. Chrysler Financial Corp.*, we recognized that a plaintiff can prove discrimination by direct evidence, but noted that a plaintiff confronts a "high hurdle." 160 F.3d 971, 976 (3d Cir.1998). In quoting Justice O'Connor's controlling opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), we held that the evidence must demonstrate that the "decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Connors*, 160 F.3d at 976. In other words, the evidence must reveal a sufficient discriminatory animus making it unnecessary to rely on any presumption from the prima facie case to shift the burden of production. *Id.*

The Court of Appeals for the Third Circuit summarized the *McDonnell Douglas* framework in indirect evidence cases:

In indirect evidence cases, the plaintiff must make a prima facie showing of discrimination. If the plaintiff cannot do so, the defendant is entitled to judgment as a matter of law. If the plaintiff does establish a prima facie case, the defendant must produce some evidence of a legitimate, nondiscriminatory reason for the adverse employment action. Once it does so, the burden remains with the plaintiff to prove by a preponderance of the evidence that the proffered reason was pretextual....

*Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 n. 4 (3d Cir.1999) (citations omitted).

The familiar *McDonnell Douglas* burden-shifting analysis is also applicable to claims of retaliation under either the PHRA or Title VII. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997); *Delli Santi v. CNA Ins. Companies*, 88 F.3d 192, 199 (3d Cir.1996).

Where the employer proffers plausible and supportable legitimate, nondiscriminatory reasons for its decision, to defeat summary judgment the plaintiff must proffer evidence "from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Showalter v. Univ. of Pittsburgh Medical Center*, 190 F.3d 231, 235 (3d Cir.1999) (citations omitted); *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997) (en banc); *Torre*, 42 F.3d at 830. In order to discredit the employer's proffered legitimate reasons for its employment decision, the plaintiff cannot simply show its decisions were "wrong or mistaken.... Rather the moving plaintiff must demonstrate such weaknesses or implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could find them unworthy of credence." *Fuentes*, 32 F.3d at 765, *citing Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 523 (3d Cir.1992).

To show discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with

sufficient probative force that a fact-finder could conclude, by a preponderance of the evidence, that discriminatory animus was a motivating or determinative factor in the employment decision. *Simpson,* 142 F.3d at 644–45, *citing Keller,* 130 F.3d at 1111. "For example, the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson,* 142 F.3d at 645, *citing Fuentes,* 32 F.3d at 765.

A prima facie case of discrimination is established where plaintiff shows he or she (1) is a member of the protected class, (2) is qualified for the position, (3) suffered an adverse employment decision, and (4) that an otherwise similarly situated person outside of the protected class received more favorable treatment. *See Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 411 (3d Cir.1999); *Pivirotto,* 191 F.3d at 355–57; *Simpson,* 142 F.3d at 644 n. 5; *Ezold,* 983 F.2d at 522.

As the Court of Appeals for the Third Circuit explained in *Jones,*

> We often have remarked that the elements of a prima facie case depend on the facts of the particular case. *See, e.g., Pivirotto,* [191 F.3d at 352]; *Torre,* [42 F.3d at 830]. Thus, a prima facie case cannot be established on a one-size-fits-all basis. In fact, the relevant question with respect to Jones's Title VII and PHRA claims is whether he suffered some form of "adverse employment action" sufficient to evoke the protection of Title VII and the PHRA. *See Connors,* [160 F.3d at 974] (stating that third element of prima facie case in disparate treatment ADEA case is that plaintiff suffered an adverse employment action); *Deane,* 142 F.3d at 142

> (same under ADA); *Simpson,* [142 F.3d at 644 n. 5]; ... Obviously, something less than a discharge could be an adverse employment action.

*Jones,* 198 F.3d at 411 (certain citations omitted). *See also Torre,* 42 F.3d at 830, *citing Billet v. CIGNA Corp.,* 940 F.2d 812, at 816 n. 3 (3d Cir.1991) (standards for establishing a prima facie case are not to be applied inflexibly or rigidly, but provide a useful framework for analysis which "must be relaxed in certain circumstances, as when there is a reduction in force.").

The prima facie case under the *McDonnell Douglas* "pretext framework is not intended to be onerous." *Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.1995) (citation omitted). The prima facie case raises an inference of discrimination because the courts presume that these acts, if otherwise unexplained, are "more likely than not based on the consideration of impermissible factors." *Id.* (citation omitted). Moreover, the nature of the required showing to establish a prima facie case of disparate treatment by indirect evidence "depends on the circumstances of the case." *Torre,* 42 F.3d at 830 (citations omitted).

The Pregnancy Discrimination Act ("PDA"), a 1978 amendment to Title VII, states:

> The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work....

42 U.S.C. § 2000e(k).

"There is employment discrimination whenever an employee's pregnancy is a motivating factor for the employer's ad-

verse employment decision. 42 U.S.C. § 2000e–2(m)." *Carnegie Center Assoc. v. Rhett,* 129 F.3d 290, 294 (3d Cir.1997). A claim of pregnancy discrimination presents a special case. Our court of appeals has held that the requirement that an adverse employment action occur under circumstances giving rise to an inference of unlawful discrimination necessitates a certain modification of the elements of the prima facie case in considering a claim of pregnancy discrimination. In *Geraci v. Moody–Tottrup, Intern., Inc.,* 82 F.3d 578, 582 (3d Cir.1996), the Court stated:

> Pregnancy, of course, is different in that its obviousness varies, both temporally and as between different affected individuals. It is difficult to imagine that an employer would not be aware that an employee is in the later stages of her pregnancy, at least if the employer sees the employee. When the pregnancy is apparent, or where plaintiff alleges that she has disclosed it to the employer, then a question of the employer's knowledge would likely preclude summary judgment. *If the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her prima facie case, evidence from which a rational jury could infer that the employer knew that she was pregnant.* [emphasis added]

### May 28, 1998 Demotion Discrimination

### Pregnancy Discrimination

 Plaintiff's counter statement of facts seriously muddies the waters in an attempt to create a genuine issue of material fact as to management's knowledge of her second pregnancy at the time Kaufmann's demoted her in May 1998, but the record is clear enough to show the evidence does not support an essential element of her claim for pregnancy discrimination. By her own testimony, plaintiff told no one at Kaufmann's until *after* the results of her amniocentesis test. Although plaintiff is vague in her memorandum of law and statements of fact as to the exact date of her amniocentesis, defendants attach a copy of that report *dated May 4, 1998* to their Reply Brief, Exhibit B. This report was faxed to plaintiff on that same day.

Plaintiff also states that, at the May 28, 1998, meeting wherein she was informed she was being demoted from manager of the fashion studio/fashion photographer to the hourly position of fashion photographer only, Ms. Joanne Pagnenelli indicated she knew of Ms. Riding's pregnancy some two weeks before. Ms. Pagnenelli denies that she stated this. In her complaint, plaintiff avers that she told Sandra Funk, Ms. Pagnenelli's secretary, on or about May 14, 1998, and inferentially therefore, that Ms. Pagnenelli knew on or about that date. Despite Ms. Pagnanelli's denial, the record supports an inference that she could have known on or about May 14, 1998, but there is *no evidence* of record to show that anyone in management knew of her pregnancy *prior to May 14, 1998.* And, the record affirmatively shows plaintiff told nobody at Kaufmann's she was pregnant before receiving the results of her amniocentesis test on May 4, 1998. The Court finds, then, that a reasonable jury could determine that management knew of plaintiff's pregnancy on May 14, 1998, *but not before.*

Plaintiff muddies the waters by stating: "Several employees in the Advertising Department were aware that Riding was pregnant even before Riding received the results of her amniocentesis, based on Riding's physical appearance, including weight gain and a change in wardrobe.... Coworkers had been asking Riding if she was pregnant as early as March or April of 1998." Plaintiff's counter statement of

material facts, ¶ 70. In support, plaintiff cites her own deposition testimony and that of four other co-workers. However, her co-workers do not support this proposition: Ms. Stonemetz said that she believed plaintiff was pregnant in May 1998; Mr. Klein heard "rumors," but did not say when; Ms. Zanotelli says plaintiff told her she was pregnant at some point, but plaintiff did not tell anyone until after the results of her amniocentesis on May 4th; Ms. Funk says only that she noticed "In the spring, some time in the spring," and she couldn't remember if it was early or late spring.

Ms. Riding herself stated she believed people noticed "probably in April, like a month before May 28," and it "could even have been in March," but she also conceded "*I don't know.*" Exhibit M to Plaintiff's Appendix in Opposition to Summary Judgment, Riding dep. at 141 (emphasis added).

Plaintiff's evidence, therefore, offers dubious support for the proposition that her co-workers surmised or suspected she was pregnant any earlier than May 1998, but *even assuming* the record could bear such an inference, plaintiff offers *no evidence whatsoever* that anyone *in management knew* she was pregnant prior to May 14, 1998, nor *could* anyone at Kaufmann's have know before May 4th *at the outside earliest.* As the Court of Appeals stated in *Geraci:*

> Geraci argues that, because she told six out of twenty co-workers that she was pregnant and that her pregnancy became a "common topic of discussion in the office," management must have known it before it terminated her. Her managers, however, filed declarations disclaiming knowledge, and Geraci presented no evidence to the contrary. Geraci deposed only one of the co-workers whom she told of her pregnancy, and he testified that he did not tell management that she was pregnant. Thus, *Geraci would have us remand this case for trial on* the *shear speculation* that one or more of the people she entrusted with highly personal information violated her confidence and that members of . . . management lied about their lack of knowledge. *This is simply insufficient to create a genuine issue of material fact.* See Hedberg [v. Indiana Bell Tel. Co., 47 F.3d 928, 932 (7th Cir.1995)] (speculation about employer's knowledge of disability does not create a genuine issue of material fact; "instead, it creates a false issue, the demolition of which is a primary goal of summary judgment").

*Geraci,* 82 F.3d at 582 (emphasis added).

Ms. Geraci had a lot more to speculate about than Ms. Riding, since at least six co-workers actually knew of Ms. Geraci's pregnancy before her adverse employment action was taken. If Ms. Geraci's evidence was insufficient "evidence from which a rational jury could infer that the employer knew that she was pregnant," then necessarily, the suspicions and vague rumors without dates that Ms. Riding offers in this case cannot satisfy *Geraci's* extra element in a pregnancy discrimination case.

Of course, if Kaufmann's decision to demote plaintiff from manager of the fashion studio to an hourly fashion photographer was made *after* May 14, 1998, plaintiff's claim of pregnancy discrimination would proceed to the jury. However, the record shows and the Court finds that, despite plaintiff's attempts to muddy the date-of-decision waters as well, management made that final employment decision *no later than April 23, 1998.*

A plausible argument could be made that the decision to remove plaintiff from her managerial position as head of the fashion studio was made much earlier than April 23, 1998. Ms. Pagnenelli first draft-

ed a plan of reorganization in the photo studio in October 1997 which would relieve plaintiff of managerial duties in the fashion studio. While at first, Ms. Pagnenelli slated plaintiff to retain executive/ managerial status, at some point Jerry Eccher and Ms. Pagnenelli discussed the matter and decided she should be an hourly employee, as the other photographers were, but at the same salary she was making as a manager.

In any event, Ms. Pagnenelli submitted her *final plan* of restructuring of the photo studio on April 2, 1998, and submitted it to Ron Grzymkowski, the Senior Vice President of Human Resources for Kaufmann's. According to Mr. Grzymkowski's undisputed affidavit [2] in the appendix to defendants' statement of material facts, he received the formal proposal from Ms. Pagnenelli, as did Mr. Eccher, on April 2, 1998. Defendants' Appendix, Exhibit N, ¶ 3. Exhibit 1 to Mr. Grzymkowski's affidavit is a copy of the "Reorganization of Photo Studios and Stylists," from Ms. Pagnenelli to Messrs. Grzymkowski and Eccher, which states:

> Due to our continuing goal toward a greater degree of "in-house production and quality control," I feel very strongly about reorganizing the Fashion and Home Photo Studios, and the Fashion Stylists Staff. The following proposal effects (sic) six people. Please review

the information and advise. Also, please note that the changes reflect a major reduction in outside services approaches, and will work within our budgets.

*Id.,* Exhibit 1, 1998 Plan of Reorganization. In addition to designating Rock Machen as photo studio manager, (with a $5,400 increase in salary, to $38,000), and the demotion of Ms. Riding from fashion photo studio manager/photographer to "senior fashion photographer" (at the same proposed salary as her current salary, $62,500), this plan of reorganization also, *inter alia,* promoted Sue Albert and Delores Windstein from hourly employees to managerial positions with substantial raises.

As Mr. Grzymkowski states in his affidavit (consistent with the deposition testimony of Ms. Pagnenelli and Mr. Eccher), because Ms. Riding's salary was not, in management's opinion, changing in any way,

> 6. ... I did not have to get corporate approval for her change in position. Therefore, after discussing the reorganization with Jerry and Joanne at length, and listening to the reasons why they felt it was the appropriate course of action, I approved the proposal to remove Riding from her management position and place her in an hourly photographer position. As for the remainder of the proposal, because there were pay

---

**2.** Plaintiff complains that Mr. Grzymkowski statement is by affidavit only, but she offers no explanation why he was not deposed, and does not offer anything to contradict his affidavit. "One of the most common forms of evidence used on a summary judgment motion is affidavits ... in support of or opposition to a Rule 56 motion...." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2722 at 54. Hearsay evidence contained in affidavits and deposition testimony may be sufficient to survive summary judgment motion unless such evidence clearly would not be admissible at trial. *Clark v. Commonwealth of Pennsylva-*

*nia,* 885 F.Supp. 694, 709 n. 3 (E.D.Pa.1995), *citing Petruzzi's IGA Supermarkets,* 998 F.2d at 1234 n. 9 ("While this statement as it stands now is hearsay, in this circuit it can be considered on a motion for summary judgment because it is capable of being admissible at trial."). *But see Maldonado v. Ramirez,* 757 F.2d 48 (3d Cir.1985) ("the affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is ' "essentially conclusory" and lacking in specific facts' is inadequate to satisfy the movant's burden."); *Citizens Bank of Elizabethton, Inc. v. Ken–Penn Amusement, Inc.,* 798 F.Supp. 268, 271 (W.D.Pa.1992) (same).

increases involved, I had to speak with the Corporate Compensation Department in St. Louis, Missouri, before approving the changes.

7. The remaining changes were approved a few weeks later and were slated to be implemented on June 1, 1998. In fact, the handwritten notation on the attached memorandum of "6/1/98" refers to the implementation date of the reorganization.

8. When I gave approval on April 23, 1998, for Nancy Riding to be removed from her management position and placed in an hourly photographer position, I did not know she was pregnant. In fact, I did not know Ms. Riding was pregnant until some time after she left Kaufmann's on her leave of absence. It was some time after June 1, 1998, when I learned that she was pregnant.

Defendants' Appendix, Exhibit N, Grzymkowski affidavit, ¶¶ 6–8.

Mr. Eccher testified, without contradiction by plaintiff, that he did not learn of Ms. Riding's pregnancy until she announced it at the meeting on May 28, 1998, at which she was informed of the demotion.

Plaintiff questions whether management's decision really was final as of April 23rd, arguing it did not become final until June 1, 1998, which was undisputedly the *effective date* of decision. However, Ms. Riding has produced no *evidence* to dispute or defeat management's evidence demonstrating it made its final decision on April 23, 1998. Because there is no evidence of record to support plaintiff's claim that anyone in management knew she was pregnant on or before April 23, 1998, and in fact, the record affirmatively shows May 14, 1998, was the earliest date anyone in management knew of her pregnancy, plaintiff is unable to prove an essential element of her claim of pregnancy discrimination with regard to her demotion of May 1998 to fashion photographer.

**Gender Discrimination**

To prove discrimination on the basis of gender for her demotion from manager of the fashion studio to fashion photographer in May 1998, plaintiff must first show (i) she is a member of a protected class (*she is*); (ii) she was qualified for the position of fashion studio manager (*she was*); (iii) she suffered some form of adverse employment action (*she did*); and (iv) that this action occurred under circumstances giving rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated more favorably (*the issue in this case*). *Jones*, 198 F.3d at 410–411; *Boykins v. Lucent Tech., Inc.*, 78 F.Supp.2d 402, 409 (E.D.Pa.2000). As previously noted, the plaintiff's prima facie case of discrimination is not intended to be onerous, rigidly applied or difficult to prove. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Pivirotto*, 191 F.3d at 352 (prima facie case is "merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination"). Accordingly, while the Court might quibble over the second element of plaintiff's prima facie case of gender discrimination,[3] the Court finds plaintiff has

---

**3.** Although defendant argues, with some support on the record, that plaintiff did not possess the requisite temperament or personality to be an effective manager of the fashion studio, the Court finds that plaintiff is, in fact, qualified for that position for purposes of a prima facie case. In Title VII cases involving disputes over "subjective" qualifications, the qualification issue should be and is most often resolved in the second and third stages of the *McDonnell Douglas/Burdine* analysis, to avoid putting too onerous a burden on plaintiff in establishing a prima facie case. *Ezold*, 983 F.2d at 523. Because, in fact, plaintiff managed first the photo studio and then the fash-

established a prima facie case of gender discrimination for purposes of this summary judgment motion, therefore shifting the burden to defendant to show legitimate, non-discriminatory reasons for its adverse employment action, *i.e.*, plaintiff's demotion to fashion photographer.

Several of plaintiff's supervisors (Ann Corbett, Joanne Pagnenelli, and Mary Ann Brown) testified at their depositions that there were numerous personality conflicts between Ms. Riding and other employees on the advertising department staff, including art directors and fashion stylists who complained about Riding's unprofessionalism and mistreatment in the studio and on the sets. Kaufmann's supervisors state they discussed these management/personnel problems with Ms. Riding on numerous occasions, and in particular, Kaufmann's presents a well-documented series of Ms. Riding's annual performance appraisals which *consistently* show Kaufmann's dissatisfaction and concerns about Ms. Riding's management skills. For example: 1992—"Less autonomous in decisionmaking. Needs to work on how to coach and counsel staff . . ."; 1993—"Work at better interaction with others," "Better communications and interaction with staff and peers," "Be patient with staff"; 1994—"Needs to generally be more tolerant, be firm, but be a teacher also." "Spend less time pointing out only mistakes." "Needs to still work in not taking direction and criticism so personally. Be more understanding of others."; 1995—"Must have stronger mindset that the entire studio is her responsibility," "Took a more active role in developing the assistant photo studio manager position, but did not follow-through on consistently monitoring his performance." Riding Annual Performance Appraisals, 1992–1995, Riding Dep. at 163–168, Exhibit 3.

In May 1996, management's concerns about Ms. Riding's managerial style resulted in a reorganization of the photo studio, relieving her of responsibility for the home studio, and placing Rock Machen as manager of the home studio. Ann Corbett was plaintiff's immediate supervisor at this time that made this decision, and, at the same time, Ms. Pagnenelli was made the overall manager of the photo studio. (Thus the decision maker and plaintiff's actual replacement were in the same protected class.)

The reorganization was not successful and Ms. Pagnenelli and Mr. Eccher continued to hear complaints from art directors, stylists and others about personality conflicts and tension on the fashion sets regarding Ms. Riding's managerial style. These problems were documented in her 1996 and 1997 annual reviews in which she received marginal or unacceptable ratings in the category of "people development."

Plaintiff's 1996 annual performance appraisal indicates:

- Initial studio turn-over was high, but staff is now in place due to concentrated efforts and changes.
- In 1997, make a greater effort to teach and constructively develop the existing staff to be more effective and prepare them to take on greater responsibilities.
- Although photo skills have developed, *managerial skills have not developed.* Excessive *followup is required.*
- Often perceived by other members of the Sales Promotion Team as confrontational and condescending. Spends too much time dwelling on the negative. *That antipathy reflects on her staff*

---

ion studio for some six years, during which the studios produced good work in a timely manner, the Court finds plaintiff qualified for the position of manager, despite defendant's

criticism of her overbearing managerial style and personality which caused tension, conflicts and personnel problems for Kaufmann's.

*throughout the Division. In 1997, concentrate on reflecting a "positive attitude" and "team interactions."*

Plaintiff's Appendix, Exhibit M, Riding Dep. Exhibit 3. Ms. Riding continued to receive effective ratings in the categories of "job accountabilities" and "job responsibilities" during this period. *Id.* (Effective is the middle of the five categories: outstanding, very good, effective, marginal, and unacceptable.)

Ms. Riding's 1997 annual performance appraisal continued to rate her either effective or very good for in the categories of "job accountabilities" and "job responsibilities" (despite comments in that category that she "Continues not to be a team player which continues to affect her overall responsibilities and those of the people who work with her," and that she "dwells on negative, petty occurrences") but continued to critique her managerial style with regard to personnel in the "people development" category as follows:

ACCOMPLISHMENTS:

— Supervisory/managerial skills have not been developed.

MISSED OPPORTUNITIES:

— Consistently, too much tension remains on the working set between the Art Directors and Stylists due to Nancy's (lack of) team workmanship.

— Needs to teach and constructively develop existing staff. Do not always and immediately think to change staff.

1998 CRITICAL ACTIONS:

• Unacceptable to "go over" and/or ignore supervisors' status. Will not be tolerated again.

• *Be "positive aggressive" not "condescending aggressive"* to others.

• Unless Nancy learns/desires to be an "interactive team player," she should not be in a supervisor position.

Riding 1997 Annual Performance Appraisal, Appendix to Defendants' Statement of Material Facts, Exhibit A–5.

Kaufmann's specifically identifies four employees who worked for or with Ms. Riding, each of whom experienced difficulties with her personality and management style and complained to management about her, and/or requested personnel changes (transfers, voluntary demotions, or even simple resignations,) in order to be taken from "underneath" Ms. Riding's supervision. The Court need not go into detail, but it has examined the referenced deposition testimony of Randy Buffington, Judy Dixon, Michael Kupniewski, and Libby Dougherty. While there may have been additional reasons for some of these employees to request job changes, it is clear that each experienced difficulties with Ms. Riding's managerial style, complained to management, and noted tension in the studios as a result of Ms. Riding's management style.

Plaintiff denies the substance of these co-workers' complaints to management, but she does not deny they made them. Whether these four employees were "right" and Ms. Riding was "wrong," and the minutiae of the personality conflicts in each instance, is not critical. What is important is that these four employees flesh out and support Kaufmann's annual appraisals and critiques of Ms. Riding's managing style as condescending, negative, and confrontational, and that Kaufmann's had to deal with the personnel fallout from the confrontations.

Ms. Pagnenelli and Mr. Eccher ultimately resolved to relieve the "festering tension" in the fashion studio, by reorganizing the staff, and removing Ms. Riding from her supervisory position. This reorganization placed Mr. Machen in charge of the fashion studio, demoted Ms. Riding to senior fashion photographer, and, *inter alia,* promoted two hourly-employed females to supervisory positions.

As will be discussed in the next section, plaintiff vigorously disputes each and every inference, characterization, and complaint lodged by any coworker or Kaufmann's manager. At this stage, however, there is certainly no doubt that defendants met their burden of offering legitimate business reasons for their employment decision of May 1998.

**Plaintiff's Evidence in Support of Pretext**

Because the employer here is able to proffer legitimate, nondiscriminatory reasons for its employment decisions, this case will go to the jury (*i.e.*, will survive defendants' motion for summary judgment), if Ms. Riding can demonstrate that its proffered reasons were merely a pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). On the record before the Court, plaintiff cannot meet her burden at this stage of proving, by a preponderance of the evidence, that Kaufmann's proffered reasons were pretexual.

Plaintiff's evidence of pretext falls generally into both broad (and sometimes overlapping or not clearly distinct) categories: (1) evidence from which a fact-finder could reasonably disbelieve the employer's articulated legitimate reasons for the demotion; and (2) evidence from which a fact-finder could reasonably find that a discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

■ In the former category, plaintiff offers some deposition testimony of a few coworkers indicating that they had problems with the managerial styles of her male predecessor, David Johns, and her successor, Rock Machen, but that these men were never demoted or otherwise disciplined over these complaints. However, plaintiff is vague about the nature of the complaints or the nature of the managerial style which some of her co-workers found distasteful in these male managers, and more importantly, she offers no proof or even really significant averments that Kaufmann's employees registered complaints to management about these managers and their managerial styles, nor is there any support in the record whatsoever that either of these managers were consistently critiqued in their performance appraisals and implored to alter their managerial styles, or that they were unable or unwilling to do so. On the other hand, Michael Kupniewski, the assistant manager of the home studio for a time, was in fact demoted, largely because of plaintiff's negative evaluations of him while she was manager of the photo studio.

Plaintiff also explains, spins, or challenges each of the specific complaints against her by the co-workers identified by Kaufmann's (Buffington, Dixon, Dougherty and Kupniewski), essentially arguing that, on each occasion, she was "right" and these co-workers were "wrong," and therefore, Kaufmann's was wrong in relying on the complaints of these individuals to demote her from a managerial position.

■ In the second category, plaintiff offers independent evidence in an attempt to show a pattern of gender discrimination throughout her employment at Kaufmann's from which a fact-finder could reasonably find that a discriminatory reason was more likely than not a motivating or determinative cause of its demotion of her in May, 1998.[4] Examples of such evidence

---

**4.** Although plaintiff uses terminology derived from the "hostile work environment" cases from time to time in her memorandum of law, she does not specifically state a hostile work environment claim nor does she attempt to persuade the Court that she has produced evidence to support the essential elements of such a claim, namely: (1) plaintiff suffered

include that "that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson*, 142 F.3d at 645, *citing Fuentes*, 32 F.3d at 765.

Plaintiff's evidence in this second category include the following. Plaintiff mentions several times in her memorandum of law and counter statement of material facts the incident in 1992 wherein, "Senior Vice President Jerry Eccher, also one of the decision makers in this case, expressed horror at the mistaken belief that Riding had had a baby after he had just offered her the position of Manager of the Fashion Studio/Fashion Photographer ..." Plaintiff's Memorandum of Law in Opposition to Summary Judgment, at 4. Although plaintiff offers this incident as direct evidence of discriminatory animus on the basis of pregnancy, only the *wildest* speculation could permit even a circumstantial inference of discrimination. The only evidence plaintiff offers to support this incident is her own testimony in which she states that at the meeting at which she was hired by Jerry Eccher and Barbara Mihopolous, they indicated that they would have a mover move her furniture from Atlanta to Pittsburgh, and they would put her up in a hotel while she was looking for an apartment. At that point, plaintiff said something like, "Oh, my gosh, my baby." Riding Dep., Plaintiff's Appendix, Exhibit M, at 36. With that, plaintiff says, "Their jaws dropped basically, and I said—I clari-

fied it quickly, I said, no, I mean I have a dog, and I was wondering where she was going to stay...." *Id.*

However, neither Mr. Eccher nor Ms. Mihopolous said anything at all about that and certainly did not say anything derogatory about having children. *Id.* "They were just—it was a visual communication between their reaction that I read from them." *Id.* Asked was it a reaction of surprise and to describe the expression, plaintiff stated, "Yes, I'd say definite surprise. They thought they were hiring a recently divorced single career woman, which I was, and they all of a sudden thought I was surprising them with having a child." *Id.*

That was plaintiff's subjective interpretation of the visual communication between Mr. Eccher and Ms. Mihopolous, and it was not based on anything either of them said. *Id.* at 36–37. To massage a facial gesture of surprise, with no negative statements being made, into an expression of "horror" displaying anti-pregnancy bias is not convincing evidence of discriminatory animus, nor does it raise an inference of discrimination.

Plaintiff also cites other instances of her having "entered an atmosphere of discrimination." Memoranda of Law in Opposition, at 1. She states that:

After starting work, a photographer named Louis Klein made a deeply offensive and highly sexist presentation about her to management which condoned it. Likewise, management condoned or at least did not punish frightening peeping-

intentional discrimination because of her membership in the protected class; (2) discrimination was pervasive and regular; (3) discrimination detrimentally affected plaintiff; (4) discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and (5) the existence of respondeat superior liability. *West v.*

*Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995), *citing Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990). The Court's discussion of plaintiff's gender discrimination claims, *infra*, will suffice to demonstrate why a hostile work environment claim also would not have survived summary judgment.

tom harassment by a male employee [Eric Allison] towards female models. Again, there is no punishment, and plaintiff was told to be silent about the matter.

*Id.* at 1–2

The "deeply offensive and highly sexist presentation" made by Louis Klein, a non-decision maker, in 1994 was, more specifically, that he "dispatched a letter to upper management in which he complained that 'Riding treats the male species like we were 2nd class people—she is divorced you know.' (Klein Dep. Exh. 24). Klein was never disciplined for his sexist statement by upper management. (Eccher Dep. at 165–67)." Plaintiff's Counter statement of Material Facts, ¶ 136. Plaintiff does not put Mr. Klein's "deeply offensive and highly sexist" letter in context, which was a letter of complaint to management in light of "the losing of a photographer" from the photo studio, which was part of a ten-page letter detailing Mr. Klein's views of the tensions and problems in the photo studio since Ms. Riding's arrival. His comment could, in fact, reasonably be construed as a complaint about Ms. Riding's discriminatory, sexist treatment of males. However, the most important thing about this comment by Louis Klein is that plaintiff does not indicate that she filed a complaint against Mr. Klein, so the fact that he was "never disciplined for his sexist statement by upper management," is not evidence of discriminatory animus by Kaufmann's. In any event, his comment was a stray remark of a non-decision maker, remote in time from the adverse employment action.

The peeping tom incident of which plaintiff complains is when Eric Allison apparently entered a fashion set in 1994 while a shoot was taking place, and saw some of the models in their lingerie or less. Plaintiff complains that this sexist incident was tolerated by management who did not punish Mr. Allison for his transgression.

However, it also appears without dispute that Kaufmann's looked into the incident, discussed it with Mr. Allison and with plaintiff, decided to close the sets of the fashion shoots except to the photographers, stylists and models, and that no further incidents of this sort happened after they made that decision. This hardly seems like Kaufmann's condoned the incident, which, again, was remote in time from the adverse employment action.

In May 1996, plaintiff was replaced as manager of the photo studio by Joanne Pagnenelli, a member of plaintiff's protected class. That decision was made by another member of the protected class, Ann Corbett, along with Jerry Eccher. Plaintiff testified in her deposition that Ms. Corbett remarked that her demotion in May 1996 was because of her strength in fashion, but also suggested it should be less burdensome for her and her family not to have the home studio responsibility. Riding Dep., Plaintiff's Appendix, Exhibit M at 113. As part of this restructuring, in May 1996, Michael Kupniewski was also demoted from his managerial position to hourly photographer, and as noted, plaintiff herself was replaced by a woman, Ms. Pagnenelli.

Plaintiff also finds discriminatory animus because "defendant never sent any cards or conveyed any expressions of goodwill to Riding when she was out on leave in 1998 nor when she had her baby in September 1998." Plaintiff's Counter statement of Material Facts at 125.

Additionally, plaintiff offers statistical evidence to support her claim of gender and pregnancy discrimination, an expert opinion report by James L. Kenkel, Ph.D., a professor of economics at the University of Pittsburgh. Plaintiff's Appendix, Ex. 6. Professor Kenkel reviewed the demographics of the employees in Kaufmann's fashion advertising department between

March 2000 and January 18, 2001, and opined that there was a statistically highly improbable number of unmarried and childless women in that department, "suggesting" that the female work force in that department had "far fewer women with children" and "far fewer married women" than "would be expected if the workforce had been selected randomly from the population of American women." Plaintiff's Supplemental Facts, ¶¶ 133–134. Plaintiff's statistical evidence is mildly interesting, but she does not put the data in context (how old were the women?), tell us what to do with it or what inferences should be gathered from it, nor does she offer any authority endorsing the use of such evidence of statistical improbability in this claim for disparate treatment.

Of course, statistical evidence may be offered in a disparate treatment case as some evidence of discrimination, *Coates v. Johnson & Johnson,* 756 F.2d 524, 540 (7th Cir.1985), if it tends to show that the employer has discriminated against other persons within the plaintiff's protected class or another protected class, or that the employer has treated similarly situated persons not within the protected class more favorably. Employment discrimination plaintiffs are not precluded from introducing statistical evidence as circumstantial evidence of discrimination in a disparate treatment case, *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Bruno v. W.B. Saunders Co.,* 882 F.2d 760, 766–67 (3d Cir.) *cert. denied,* 493 U.S. 1062, 110 S.Ct. 880, 107 L.Ed.2d 962 (1990), but such evidence is often viewed as not very important. *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1217 (3d Cir.1995), citing *King v. General Elec. Co.,* 960 F.2d 617 (7th Cir.1992).

Plaintiff appears to be attempting to identify a class of non-married women without children as a group of similarly situated persons who are treated more favorably, because they are hired, but she does so in a vacuum, with no attempt to show how this group is treated more favorably at work than plaintiff's group, married women with children (which is not necessarily a protected class). However,

Granting that statistics "when properly authenticated, constitute an accepted form of circumstantial evidence of discrimination," ... we are still *sobered by warnings that statistical evidence has an "inherently slippery nature," .... and "can be exaggerated, oversimplified, or distorted to create support for a position that is not otherwise supported by the evidence." ...* Thus, the weight of statistical proof relies implicitly on "the existence of proper supportive facts and the absence of variables which would undermine the reasonableness of the inference of discrimination".

*Spaulding v. Univ. of Washington,* 740 F.2d 686, 703 (9th Cir.1984), *citing Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Moreover, to carry evidentiary weight, statistics must be relevant, material and meaningful. *Teamsters,* 431 U.S. at 340, 97 S.Ct. 1843.

While the Court assumes plaintiff's statistical analysis may be relevant, she has made no attempt to show its materiality or meaning to her claims of pregnancy or gender discrimination during her employment. Without placing her statistics in context and without showing (statistically or otherwise) that Kaufmann's historically discriminates in its treatment of married or childless women, Dr. Kenkel's report *at most* describes an interesting anomaly, but it does not raise an inference of discrimination and it adds nothing to plaintiff's case.

Plaintiff points to a handful of allegedly sexist or pregnant-discriminatory remarks

and a facial expression made by non-decision makers or decision makers unrelated to the adverse employment actions that were remote in time from her demotion in May 1998. Such stray remarks (or stray facial gestures) are rarely entitled to great weight, *Pivirotto*, 191 F.3d at 359, *quoting Ezold*, 983 F.2d at 545, and this case is no exception, especially where, as here, each remark or facial gesture complained of is susceptible of neutral interpretations.

Plaintiff also points to Kaufmann's treatment of her predecessor and successor and its failure to demote or discipline them for "similar" managerial deficiencies, and to supposedly favorable treatment shown to males who displayed sexist conduct in 1994. As in *Pivirotto*, this Court finds Ms. Riding's "evidence of the allegedly better treatment of male employees weak and not probative of discrimination." *Pivirotto*, 191 F.3d at 359. Plaintiff has not produced annual performance appraisals of David Johns (the predecessor) or Rock Machen, nor has she otherwise documented or demonstrated the sort of "people development" deficiencies of which she was consistently appraised in annual reviews, and the 1994 Klein and Allison incidents are pretty much *non sequiturs*.

This is not all of plaintiff's evidence of discriminatory intent, but it is her strongest evidence, and it is representative of the pattern of discrimination she alleges and perceives. Neither individually, nor collectively, do these sporadic, isolated and mostly remote incidents show an invidious discriminatory reason for plaintiff's demotion in May 1998, rendering it more likely than not that discrimination was a motivating cause of Kaufmann's action.[5]

Nor does plaintiff's evidence demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradiction in the employer's proffered legitimate reason for demoting Ms. Riding in May 1998—because of the tension and personality conflicts generated by Ms. Riding as manager in the photo and fashion studios as consistently reflected in the "people development" category of her annual performance appraisals from 1992 to 1997—such that a reasonable fact-finder could find these stated reasons unworthy of credence.

Although plaintiff claims she is more qualified than Rock Machen, who replaced her as manager of the fashion studio, her opinion is subjective (and, more importantly), this "single comparator" cannot be viewed in a vacuum but, instead, must be placed in context of the record as a whole, viz Kaufmann's treatment of its female employees and managers. *Simpson*, 142 F.3d at 645–47 (at pretext stage, where the factual inquiry into alleged discriminatory motives rises above plaintiff's prima facie case "to a new level of specificity," plaintiff cannot "pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she.") Looking at the whole picture, plaintiff's immediate super-

---

5. Plaintiff relies on this same "pattern and practice" evidence in a half-hearted attempt to state a mixed motives/ direct evidence case (which would shift the burden to defendants to show it would have made the same employment decisions in the absence of an illegitimate motive). Plaintiff's Memorandum in Opposition, at 3–4. Plaintiff's evidence does not overcome the "high hurdle" identified by the Court of Appeals for the Third Circuit in *Connors*, 160 F.3d at 976, for "direct evidence," i.e., "overt or explicit evidence which *directly reflects* a discriminatory bias by a decision maker," *Armbruster*, 32 F.3d at 782 (emphasis added), and which shows the "decision makers placed *substantial negative reliance on an illegitimate criterion in reaching their decision*." *Connors*, 160 F.3d at 976 (emphasis added).

visors and decision makers in 1996 and 1998 were women, her replacement in 1996 was a woman, two women were promoted from hourly to supervisory positions in the reorganization in May 1998, and the Court notes a predominance of female managers in the hierarchy of the advertising department. The promotion of one male comparator to take plaintiff's position in May 1998 assumes reduced significance in light of the bigger picture at Kaufmann's fashion department.

Furthermore, much if not most of plaintiff's evidence offered to show pretext challenges her former employer's view as to what are the most important qualifications for a manager to possess. In Ms. Riding's view, her consistent effective performance in production of the work product at the photo and fashion studios is paramount, and must be deemed to override management's concerns and frequent personnel problems caused by her confrontational managerial style. However, it is within the employer's discretion to decide the relative importance of particular criteria or qualifications necessary and desirable for its managers to possess. As the Court stated in *Simpson:*

> In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, *the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action. Ezold,* 983 F.2d at 528. *The employee's positive performance in another category is not relevant., id.,* and *neither is the employee's judgment as to the importance of the stated criterion. Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1216 (3d Cir.1988). Furthermore, the court does not subjectively weight factors it considers important. *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 331 (3d Cir.1995); *see also Ezold,* 983 F.2d at 528 (rejecting district court's

> subjective weighing of plaintiff's abilities). Rather, the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion. *Fuentes,* 32 F.3d at 767.

*Simpson,* 142 F.3d at 647 (emphasis added). *See also Pivirotto,* 191 F.3d at 359.

Plaintiff "may quarrel with" Kaufmann's conclusions regarding the particulars of various conflicts and controversies with various (and numerous) co-workers, but "the *bona fides* of its determinations simply cannot be doubted." *Jones,* 198 F.3d at 414. That is, Ms. Riding cannot show she satisfied the criterion *identified by Kaufmann's* as necessary to manage the photo or fashion studios (the ability to manage in a positive, non-condescending manner so as to minimize, rather than foster, tension and conflict), or that Kaufmann's did not *in fact rely* upon her perceived deficiencies in "people development" skills in making its decision to demote her in May 1998.

For all of the foregoing reasons, the Court holds that defendant is entitled to summary judgment at the third, pretext stage of the *McDonnell Douglas* analysis, because plaintiff has not produced adequate evidence from which a fact-finder could reasonably conclude that defendant's legitimate business reasons for her demotions in May 1996 or May 1998 were pretext, or that its real motivation was discriminatory animus on the basis of gender or pregnancy.

**November 1998 Demotion—Discrimination, Retaliation, Constructive Discharge**

██ Plaintiff claims Kaufmann's discriminated against her on the basis of gender and pregnancy when it "demoted" her in November, 1998, from "senior fashion

photographer" (as listed in the Pagnanelli plan of reorganization in May, 1998) to "merchandise photographer," a position she deems inferior and degrading to one of her experience, skills and expertise in fashion photography. She also claims this demotion was in retaliation for her complaining on May 29, 1998, and subsequently to Human Resources that she had been discriminated against on May 28th and previously, and that, when she refused to accept Kaufmann's offer of a position as merchandise photographer in December, 1998, she was constructively discharged. Defendants argue there was no adverse employment action in plaintiff's "reassignment" to merchandise photographer, that it did not retaliate against plaintiff, and that her voluntarily resignation from Kaufmann's does not qualify as a constructive discharge.[6]

Under the circumstances of the case, all three claims share the same factual foundation. Moreover, plaintiff's claims of discrimination, retaliation and constructive discharge are legally interrelated, as each shares a common essential element of the respective prima facie cases, namely, a tangible adverse employment decision.[7]

As part of her prima facie case for discrimination, plaintiff must show that she suffered an adverse employment decision when she was reassigned or demoted from fashion to merchandise photographer in November 1998. *Simpson,* 142 F.3d at 644 n. 5. An adverse employment action

must result in serious tangible harm which alters an employee's compensation, terms, conditions or privileges of employment. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 749, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (defining tangible, adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits"). The Court of Appeals for the Third Circuit "fleshed out" the contours of a "tangible adverse employment action" in *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 152–54 (3d Cir.1999), wherein it noted that direct economic impact is an important factor in deciding whether an employer's action is a tangible adverse employment action, but "it is not the sine qua non. If an employer's act *substantially decreases an employee's earning potential and causes significant disruption* in his or her working conditions, a tangible adverse employment action may be found." *Id.,* at 153 (emphasis added).

To establish a prima facie claim of retaliation, a plaintiff must show that he/she is engaged in protected activity, that the employer took an adverse employment action against him/her, and that there is a causal connection between the protected activity and the adverse employment action. *Goosby v. Johnson & Johnson Medical, Inc.,* 228 F.3d 313, 323 (3d Cir.2000), *citing Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997).

Where, as here, a plaintiff is on maternity leave at the time the alleged discrimination takes place, "her status as a member of the protected class is evident ..." *Id.* at 753–54.

---

**6.** Defendants also argue that inherently, an employee cannot be discriminated against on the basis of pregnancy after she gives birth. The several cases defendants offer to support this superficial argument are taken out of context and are unpersuasive. The Court finds that discrimination on the basis of pregnancy does not automatically cease once the baby is born, but that the effects of same may linger for some period of time following the birth. *See Solomen v. Redwood Advisory Co.,* 183 F.Supp.2d 748, 753–55 (E.D.Pa.2002).

**7.** The following *prima facie* case analyses of the claims of discrimination, retaliation and constructive discharge apply to both Title VII claims and claims under the PHRA. *See, e.g., Pivirotto,* 191 F.3d at 352 n. 4; *Goosby,* 228 F.3d at 318, 323.

A plaintiff who voluntarily resigns may assert a claim of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge. *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1079 (3d Cir.1992). An employer may be liable on a constructive discharge theory when an employee is forced to resign his or her job because the employer knowingly permitted conditions of discrimination to persist so intolerable that a reasonable person subject to them would resign. *See Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir.2001). The resignation is treated as if it were an outright dismissal by the employer, rendering the resignation an "adverse employment action" which can serve as the basis for discrimination or retaliation claims. *See Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 167–68 (3d Cir.2001) (constructive discharge as basis for age discrimination claim); *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1084–85 (3d Cir.1996) (constructive discharge as basis for race and retaliation claims). The Court must use an objective test to determine whether "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.*

Under circumstances such as are presented here, these claims frequently overlap, and it is not surprising to find combinations of discrimination, retaliation and constructive discharge cases arising from some employment action short of discharge which an employee claims was in retaliation for complaining about discrimination and renders her working conditions intolerable. *See, e.g., Weston v. Commonwealth of Pennsylvania,* 251 F.3d 420 (3d Cir.2001) (applying *Ellerth* test for tangible adverse employment action in retaliation claim context); *Durham; Robinson.* There is an *objective threshold* that must be crossed, prima facie, by plaintiff in each case: the employer's action which forms the factual foundation of each claim *must work some serious and substantial tangible harm,* which alters an employees compensation, terms, conditions or privileges of employment, and, in the case of a claimed constructive discharge, makes working conditions *so unpleasant* or intolerable that a *reasonable person in the employee's shoes* would resign.

Transfers and reassignments without loss of pay, benefits or other direct or immediate economic consequences may often be deemed to have passed this objective threshold, and qualify as an adverse employment decision. *See e.g., Mondzelewski v. Pathmark Stores, Inc.* 162 F.3d 778, 787–88 (3d Cir.1998) (in ADA case alleging retaliation, court recognizes that "Assigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions," and that where Pathmark reassigned the plaintiff to a shift considered the "punishment shift" by him and his co-workers, plaintiff sustained a serious-enough adverse employment decision); *Torre,* 42 F.3d at 831 n. 7 (in ADEA discrimination case, "Torre has created a material fact issue concerning whether he was transferred ... to a dead-end job that had effectively been eliminated before he was transferred to it"), *citing Collins v. Illinois,* 830 F.2d 692, 702–04 & 702 n. 7 (7th Cir.1987) (collecting transfer as adverse employment decision cases); *Robinson,* 120 F.3d at 1300 (in retaliation case under Title VII, Court recognizes that "Retaliatory conduct other than discharge or refusal to rehire is thus proscribed by Title VII only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee.' " emphasis added); *Durham,* 166 F.3d at 155–56 (finding constructive dis-

charge "for essentially the same reasons that we conclude that Evans suffered adverse employment action. Constructive discharge exists if 'the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.' *Goss,* 747 F.2d at 887–88. *Goss* found that a reassignment to a less lucrative territory could constitute a constructive discharge, based on the substantial pay cut involved and the employee's loss of confidence in herself and her employer.... [T]he loss of Evans's office and files constituted a substantial worsening of her working conditions at Durham." footnote omitted).

On the other hand, as the Court of Appeals for the Third Circuit stated in *Robinson:*

> It follows that *"not everything that makes an employee unhappy"* qualifies *as retaliation,* for '[o]therwise, minor and even trivial employment actions' that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' " *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996) (*quoting Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996)).
>
> Courts have operationalized the principle that retaliatory conduct must be *serious and tangible enough* to alter an employee's compensation, terms, conditions, or privileges of employment into the *doctrinal requirement* that the alleged retaliation constitute 'adverse employment action.' *See Williams,* 85 F.3d at 273 .... Accordingly, just as we concluded that a quid pro quo plaintiff must show a 'quo' that is serious enough to alter his or her 'compensation, terms, conditions, or privileges' of employment, we hold that the 'adverse employment action' element of a retaliation plaintiff's prima facie case incorporates the same requirement that the retaliatory conduct

rise to the level of a violation of 42 U.S.C. § 2000e–2(a)(1) or (2).

*Robinson,* 120 F.3d at 1300–01 (additional citations omitted; emphasis added).

*Robinson* approved and followed the analysis of the Court of Appeals for the Seventh Circuit in *Smart,* which discussed and distinguished several of its precedents finding no adverse employment action when the employee was transferred or reassigned. These cases are quite illuminating in the instant case, and therefore, that discussion is repeated:

> In *Crady v. Liberty National Bank & Trust Co. of Indiana,* 993 F.2d 132 (7th Cir.1993), we found that a change in title from assistant vice-president and manager of one branch of a bank to a loan officer position at a different branch did not by itself constitute an adverse employment action. Another case where adverse employment action was found to be absent is *Spring v. Sheboygan Area School District,* 865 F.2d 883 (7th Cir. 1989). In *Spring,* a 65–year–old school principal was offered the choice between retirement and transfer to a different school as part of a school district reorganization plan. The transfer would have afforded the principal a two-year contract and a merit pay increase, but she would have had to share the position with a co-principal. The court found that the 'humiliation' she claimed the co-principal arrangement would cause did not constitute an adverse employment action because 'public perceptions were not a term or condition of Spring's employment.' *Spring* at 886. The only negative employment-related consequence of the transfer was found to be an increase in the distance she had to travel to work. This alone did not constitute an actionable adverse employer action. Likewise, in *Flaherty v. Gas Research Institute,* 31 F.3d 451 (7th Cir.

1994), we found that a lateral transfer, where the employee's existing title would be changed and the employee would report to a former subordinate, may have caused a 'bruised ego,' but did not constitute an adverse employment action. Most recently, in *Williams*, we found that the strictly lateral transfer of a salesman from one division of a pharmaceutical company to another was not an adverse employment action.

*Smart*, 89 F.3d at 441–42.

■ The primary issue with regard to the November and December 1998 employment actions [8] is whether Ms. Riding's reassignment from fashion photographer to merchandise photographer was *serious and tangible enough* to alter her compensation, terms, conditions, or privileges of employment so as to constitute a tangible adverse employment action. If so, it would be appropriate to continue the prima facie and *McDonnell Douglas* analyses. If not, *all three* of her remaining claims must fail.

Because there was no discrimination in removing plaintiff from her fashion studio manager position effective June 1, 1998, and reassigning her to senior fashion photographer, the *starting point* for our analysis of the events of November and December is with plaintiff as senior fashion photographer, not fashion photographer/ fashion studio manager, as plaintiff would have it.

When plaintiff commenced pregnancy/ maternity leave on doctor's orders on May 29, 1998, Kaufmann's made an employment decision to maintain her executive level benefits, rather than hourly employee benefits. The difference was significant; executive benefits meant full salary for 90 days, while hourly benefits for maternity leave meant 12 weeks at $190.00 a week.

After the expiration of her leave, Kaufmann's informed plaintiff that her executive level benefits would be continued until December 1, 1998.

In November, plaintiff began to make inquiries about the position to which she would be returning upon expiration of her leave, and she was advised she would be returning as a "merchandise photographer." Ms. Riding was aghast at this notion, as she believed a merchandise photographer would only shoot pots and pans and the like, not fashion. To her, that would be degrading.

Defendants offer evidence now to show that Rock Machen, plaintiff's new supervisor, only intended for her to shoot household merchandise until she got up to speed on digital photography, which was in place in the home studio since 1995, but not in the fashion studio until 1999, and Ms. Pagnanelli indicated that "merchandise" meant *all types* of merchandise, not just household goods but fashion too. Kaufmann's also produced evidence that it had decided (between May and November, 1998) that all of its photographers would shoot all types of merchandise, although some would concentrate more on one side of the studio than the other (this reorganization is not well documented, as was the May 1998 plan of reorganization), and that the two primary fashion photographers, Gary Lavin (who was hired in the fall of 1998, along with Jennifer Purcell, to shoot mostly fashion, since the fashion studio was short-handed) and Michael Kupniewski, each shot about 60% fashion and 40% home merchandise.

Plaintiff disputes these numbers and the revised photographer assignment plan as pretext, and therefore infers punishment and discrimination, but offers no evidence

---

**8.** Plaintiff asserts that Mr. Melissinos harassed her in December with a series of telephone calls, voice messages and faxes, but the record does not support any harassment in the communications between them.

to dispute defendants' evidence in this regard. In any event, the communication between plaintiff and Kaufmann's in November, 1998, was bad (the parties of course dispute who was to blame for the faulty communications), and the Court cannot say that plaintiff knew or was informed precisely what it would mean to be a merchandise photographer when she returned.

Ultimately, however, these preliminary factual disputes are inconsequential and immaterial, because the picture cleared up with phone calls, faxes, and letters at the end of November and into December, 1998, between plaintiff or her newly retained counsel and counsel for Kaufmann's. Plaintiff did not report to work on December 1, 1998, and a series of letters and phone calls ensued. Finally, on December 15, 1998, Ms. Tony Douaihy, Esquire, Counsel for Kaufmann's, advised plaintiff's counsel in writing that Kaufmann's was

holding a position open for Ms. Riding until Friday, December 18, 1998. The position is "Merchandise Photographer." As I explained, the position is the same as that held by Ms. Riding immediately prior to her leave of absence ("Fashion Photographer") except that she will be responsible for photographing all types of merchandise. Her hourly rate of pay, hours of work and other terms and conditions of employment remain the same.

Letter of December 18, 1998, from Kaufmann's Counsel, Plaintiff's Appendix, Exhibit 43 to Exhibit K, Pagnanelli Dep. The letter further reiterates that Ms. Riding's salary would continue to remain "equal to that she received as manger," (meaning she would remain the highest paid employee in the Photo Studio), and, in fact, she might make more money, depending on overtime, and indicates that plaintiff had advised Kaufmann's, through counsel, that she would be willing to return to work to her "prior position" as fashion photography *manager* only. *Id.* Because Ms. Rid-

ing considered this reassignment to merchandise photographer to be demeaning, unpleasant, discriminatory and retaliatory, *Id.*, at Exhibit 14, Letter of November 30, 1998, from Ms. Riding to Mr. Melissinos, plaintiff was unwilling to return to work under those conditions.

A factfinder could not reasonably find that Kaufmann's took a tangible adverse employment action against plaintiff when it reassigned her to merchandise photographer in November 1998. No doubt, and understandably, this change bruised plaintiff's ego; indeed, many people might have experienced similar hurt feelings or humiliation in that situation. Nor does the Court doubt the sincerity or depth of plaintiff's subjective feelings.

However, objectively viewed, this is not serious or tangible enough to show the adverse employment action necessary to prove that Kaufmann's discriminated, retaliated or constructively discharged plaintiff. *Compare Jones*, 198 F.3d at 412 (change of teacher's job assignments from physics teacher to general science teacher, and transfer to a school which had the reputation of being "difficult" may suffice to demonstrate plaintiff was subjected to sufficient adverse employment action such that his Title VII and PHRA claims for discrimination should have survived the initial, prima facie stage, of the *McDonnell Douglas* analysis); *Durham*, 166 F.3d at 153–55 ("loss of Evan's office, the dismissal of her secretary, the missing files, and the lapse assignments that led to a 50% pay decrease are tangible adverse employment actions ... [and] for essentially the same reasons ... we conclude that Evans suffered adverse employment action," sufficient to find that she was constructively discharged); *Mondzelewski*, 162 F.3d at 787 (meat factory worker's reassignment to shift leaving him less free time and requiring him to work Saturday evenings was sufficient to raise a triable issue as to

whether the terms, conditions and privileges of is job were altered in retaliation for discrimination complaint, especially where such shift was considered a "punishment shift" by co-workers); *Torre,* 42 F.3d at 831 and n. 7 ("Title VII does not limit adverse job action to strictly monetary considerations. One does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." collecting cases—transfer to "dead end job" was adverse employment action); *Goss,* 747 F.2d at 888–89 (applying objective, reasonable person test, Court finds plaintiff constructively discharged where she was subject to a series of derogatory comments by management shortly following her maternity leaves about her ability to combine motherhood with a career, and then was reassigned from her much more lucrative sales territory to an inferior territory where she was likely to make less commission); *with Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 167–70 (3d Cir. 2001) (plaintiff set forth a pattern of incidents which she contended showed continuous discriminatory treatment at Paper Magic, including that she was not considered for promotion to manager, that her department was consistently understaffed, that supervisors made some negative remarks about her age, and that she was excluded or prevented from participating in several committees or training seminars or other work experiences that would help her chances of advancement, *inter alia.* But because her employer never threatened to fire her, encouraged her to resign from her position, or involuntarily transferred her to a less desirable position, "The situation does not reach the threshold of 'intolerable conditions.' Although certainly stressful and frustrating, the alleged conduct would not compel a reasonable person to resign."); *Robinson,* 120 F.3d at 1300–01 ("Robinson's allegations that she was subjected to 'unsubstantiated oral reprimands' and 'unnecessary derogatory comments' following her complaint do not rise to the level of the 'adverse employment action' required for a retaliation claim."), *citing, inter alia, Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) ("Obviously a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either."); *Connors,* 160 F.3d 971 (No constructive discharge where plaintiff was given choice of declining employment with acquiring company and retaining the target's retirement benefits or remaining as an employee of the acquiring corporation with replacement of the retirement benefits of the target with those of the acquiring corporation); *Gray,* 957 F.2d at 1078–80 (applying the objective *Goss* test for constructive discharge, collecting and discussing constructive discharge cases, and concluding that no reasonable inferences from the evidence would allow a jury to infer that Gray was discriminated against on the basis of age: "Initially it should be reiterated that, even if Gray [a seasoned reporter] had been reassigned from [her usual] 'courthouse beat' to a 'demeaning' general reporting assignment, the proposed reassignment would have involved no loss of pay or change in title.... The law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenged and disappointments; these inure in the nature of work. An employee ... is not ... guaranteed a working environment free of stress...."), *quoting Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *Boykins,* 78 F.Supp.2d at 415

("Transfers are not automatically immune from classification as an adverse employment action.... This Court agrees, nonetheless, that under the circumstances present in this case, plaintiff has not established that he suffered an employment action. Conceding that he suffered no loss in pay or change in shift or hours, plaintiff also fails to point to any evidence in the record that these transfers denied him of any employment opportunity or altered any employment rights, *e.g.*, that these were permanent reassignments from which his employment opportunities were limited.").

The Court's determination that there was not a tangential adverse employment action is bolstered by the fact that the employer explicitly informed plaintiff on December 15th that she would be returning to the position she held "immediately prior to her leave of absence (Fashion Photographer")" except that she will be responsible for "photographing all types of merchandise," and that her "hourly rate of pay, hours of work and other terms and conditions of employment remain the same." While plaintiff believed this meant she would be permanently assigned to shoot only pots and pans and other household goods, it is at least plausible (if not more likely) that "all types of merchandise" included fashion. For plaintiff to walk away from the job assignment of merchandise photographer after accepting extended executive level maternity leave benefits for over seven months, without clarifying any ambiguity about her expectations about that position by further inquiry or by returning to work and testing the waters, was premature. As was stated in *Connors:*

> to the extent that the general offer of employment can be labeled ambiguous, Connors had a *duty to attempt to clarify the situation before retiring.* Connors did not try, and so he cannot rely on any ambiguity to support his constructive discharge claim. In *Gray*, we denied a coplaintiff's claim that she was constructively discharged when she received no answer to her inquiry whether an imminent reduction in her hours would result in losing some benefits. We stated that "[i]t is unrealistic to expect that ... an employee will make a decision of such magnitude as the decision to retire on the basis of such an assumption without further inquiry into the matter." *Gray*, 957 F.2d at 1086. Other cases have noted that, in most situations, a *prerequisite to a successful constructive discharge claim is that the plaintiff attempted to explore alternatives before electing to resign. See, e.g., Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir.1993).

*Connors*, 160 F.3d at 975 (emphasis added).

For all of the foregoing reasons, the Court holds that there was no tangible adverse employment action taken against plaintiff in November and December 1998, and therefore, plaintiff has not shown an essential element of the prima facie case for each of her claims stemming therefrom, discrimination, retaliation or constructive discharge.[9] As the Court already

---

**9.** Because the Court finds plaintiff cannot establish her prima facie case, it need not address defendants' argument that plaintiff's claim for retaliation should be dismissed because she failed to exhaust her remedies by failing to file a charge of retaliation with the EEOC. The limits of the district court action is "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination...." *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir.1976) (citations omitted). When a claim for retaliation is not specifically presented to the EEOC, the test for whether that claim can be presented to the district court is "whether the acts alleged in the subsequent Title VII suit are fairly within the

has determined there was no gender or pregnancy discrimination with regard to Ms. Riding's demotion in May 1998, summary judgment will be granted in defendant's favor as to all counts of plaintiff's complaint. An appropriate order will be entered.

### ORDER OF COURT

**AND NOW,** this **8th day of August, 2002,** it is **HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Document No. 28), is **GRANTED**.

**IT IS FURTHER ORDERED** that summary judgment is entered in favor of defendants on all counts.

scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry,* 82 F.3d 1291, 1295 (3d Cir.1996), *citing Waiters v. Parsons,* 729 F.2d 233, 237 (3d Cir.1984). Without deciding, it would appear

that plaintiff's claim of retaliation would fall within the scope of her EEOC charges, or that its investigation reasonably would have led to that claim.