Leo G. CONNORS, Appellant,

v.

CHRYSLER FINANCIAL CORPORATION; Chrysler First, Inc.; NationsBank Corporation; NationsCredit Corporation; John P. Tierney; Robert A. Major.

No. 98–1036.

United States Court of Appeals,
Third Circuit.

Argued Oct. 7, 1998.

Decided Nov. 17, 1998.

Harold I. Goodman (Argued), Raynes McCarty Binder Ross & Mundy, Philadelphia PA, Attorney for Appellant

Jane L. Dalton, Duane Morris & Hecksch-er, Philadelphia PA, Thomas G. Kienbaum (Argued), Kienbaum Opperwall Hardy & Pelton, PLC, Birmingham, MI, John J. Myers, William J. Clemick (Argued), Eckert Seamans Cherin & Mellott, Pittsburgh PA, Attorneys for Appellees.

Before: BECKER, Chief Judge,
NYGAARD, and NOONAN,* Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

Leo Connors brought claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. # 8E8E # 951 *et seq.*, against NationsBank and Chrysler Financial Corporation. Connors claims he was constructively discharged by a forced retirement when NationsBank took over Chrysler First Inc. ("CFI"), a subsidiary of Chrysler Financial Corporation, in early 1993. He appeals from the district court's summary judgment in favor of the defendants. We will affirm.

### I.

There is no need to differentiate between Connors's ADEA and PHRA claims because, for our purposes, the same analysis is used for both. *See, e.g., Simpson v. Kay Jewelers,* 142 F.3d 639, 643–44 & n. 4 (3d Cir.1998); *Fairfield Township Volunteer Fire Co. No. 1 v. Commonwealth,* 530 Pa. 441, 609 A.2d 804, 805 (Pa.1992). As we have said, "each ADEA case must be judged on its own facts." *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 (3d Cir.1988).

The ADEA prohibits employers from discriminating against an individual in hiring, discharge, compensation, term, conditions, or privileges of employment on the basis of age. *See* 29 U.S.C. § 623(a)(1). Age discrimination may be established by direct or indirect evidence. *See Torre v. Casio, Inc.,* 42 F.3d 825, 829 (3d Cir.1994).

### II.

The facts of this case are, for the most part, undisputed. Any disputed facts will be set out in a light most favorably to Connors. Leo Connors was an executive with CFI and its predecessors since 1961. From 1977 until 1992, Connors served as Treasurer and Chief Financial Officer of CFI. In late 1991, because his working relationship with the Chief Executive Officer of CFI, Robert Major, had deteriorated, Connors spoke with Robert "Terry" Ray, Senior Vice President of Human Resources and Administration at CFI, about Connors's future at CFI. These conversations eventually focused on Connors stepping down as Chief Financial Officer and either accepting another position or taking a retirement package.

Connors told Ray that Major subjected Connors and his staff to verbal abuse and unprofessional treatment. In addition, Connors revealed that Major had expressed unhappiness with the number of hours that Connors was working and the amount of vacation he was taking.

The discussions concerning Connors's future continued in early 1992 and culminated in Connors stepping down as CFO in March 1992 and becoming Senior Vice President, Director of Special Operations. Connors retained his job grade and salary and was assigned a list of tasks to complete in his new position.

Although Connors had previously projected a July 1993 retirement date, the district court noted that it appeared that his intentions changed when he transferred to the new job. During the discussions regarding his new position, Connors sought an arrange-

* Honorable John T. Noonan, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

ment whereby upon completion of the assigned tasks, he could stop working full-time, but continue to receive a full salary until his expected retirement date. He wanted a severance package that had been given to several other executives at the end of their careers. These other executives were also placed in positions that were to be eliminated, enabling them to take advantage of the extra benefits, including a one-year salary continuation. There is no indication that an agreement was reached on a severance package before Connors changed jobs in March 1992.

In May 1992, Chrysler Financial made the decision to sell CFI. The concern that key executives would leave because of the uncertainty inherent in such a sale prompted CFI to sign several key executives to employment contracts. Because he had left his position as CFO, Connors was no longer considered a key executive and so was not offered one of these contracts. In late 1992, NationsBank agreed to purchase CFI. The sale eventually closed on February 1, 1993.

The purchase agreement reached between the parties required NationsBank to offer a comparable position to every active CFI employee for an employment period of sixty days with the same compensation. As part of the deal, as soon as CFI employees became NationsCredit[1] employees after the closing, they would no longer be eligible to participate in any CFI benefits program, including the CFI retirement program. It is undisputed that the CFI retiree benefits program was far superior to the plan offered by NationsCredit and that the latter was substantially equivalent to the plan available to all other NationsBank employees.

On January 12, 1993, Major sent a "Q & A" letter to the 2000 current CFI employees containing information about the sale. Included in this memo was the fact that all employees would be offered employment with NationsCredit. The next day, CFI sent another letter to all retirement-eligible CFI employees, including Connors, outlining the differences between the retirement packages of CFI and NationsCredit and informing

them that if they wanted to retire as CFI employees, they had to elect to do so before closing. This letter reiterated that every CFI employee who did not choose to retire from CFI before closing would be offered a position with NationsCredit. Connors made no effort to obtain any more information on the job offer from either CFI or Nations-Bank. Connors did not communicate with any representative of NationsBank about any matter relating to his employment, either before or after his retirement.

On January 28, 1993, Connors told CFI that he would retire before the sale. After Major was told of this decision, he called Connors and asked him if he was interested in working as a consultant until the pending projects were completed. Under this arrangement, Connors would retire from CFI and then work for NationsCredit as a consultant. This arrangement would likely have kept him working through June 1993. Connors rejected this consulting arrangement and wrote a letter to CFI characterizing his retirement as "involuntary." Connors was sixty-five years old.

Connors then sued, among others, NationsBank and CFI claiming that he had been discriminated against because of his age. The district court had subject matter jurisdiction over the ADEA claims pursuant to 29 U.S.C. § 626(c)(1) and 28 U.S.C. § 1331, and supplemental jurisdiction over the PHRA claims pursuant to 28 U.S.C. § 1367(a).

### III.

When evaluating ADEA discrimination claims based on indirect evidence, we apply a "slightly modified version" of the three-step *McDonnell Douglas* shifting burden analysis developed by the Supreme Court for use in Title VII discrimination cases. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997) (en banc). Under *McDonnell Douglas,* Connors must first establish a prima facie case using indirect evidence by showing that he (1) was a member of a protected class, i.e., that he was over 40, (2) was qualified for the position at

---

1. After the sale, CFI became known as NationsCredit. *NationsCredit is a division of Nations-* Bank.

issue, (3) suffered an adverse employment action; and (4) was ultimately replaced, or the position was filled by, a younger person. The evidence must be "sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case." *Id.* The district court found that Connors had failed to show a prima facie case because he did not produce evidence sufficient to convince a reasonable factfinder that he had established element (3), the existence of an adverse employment action. We agree. Because we too conclude that Connors fails at the first step, it is not necessary to analyze steps two and three of the *McDonnell Douglas* scheme.[2]

Connors asserts that he established a prima facie case based on his claim that he suffered an adverse employment action because he was constructively discharged by CFI and NationsBank when they did not explicitly offer him a job at the takeover. The test applied to constructive discharge claims is objective whether a reasonable jury could conclude that CFI and NationsBank permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign. *See Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 173 (3d Cir.1988).

Connors argues that such unpleasant or difficult conditions arose when he was forced to choose between retirement from CFI or an uncertain future at NationsCredit. Connors was given the choice of retiring as a CFI employee with all the attendant CFI retirement benefits or going to work as an employee of NationsCredit with NationsCredit benefits. Despite the claim in his resignation letter that his retirement was "involuntary," it is apparent from the record as a whole that Connors retired from CFI only after making an informed decision based on economic realities.

Connors's retirement letter reflects his decisionmaking process. He stated that:

[a]lthough I understand that all employees of CFI are to be offered positions in Nations Credit following the transfer ..., the

benefits to myself as a CFI employee would be significantly less as an employee of[a NationsBank] entity. Specifically, the increased cost of health insurance and the loss of vehicle leasing and purchasing are not offset by any benefits under Nations Bank.

(App.140) In an earlier letter, Connors had stated:

I understand the agreement requires [NationsBank] to offer every employee of CFI a position but contend that such is not an option for me. Even without having the specific benefits comparison, I have heard enough to know that I really do not have a reasonable choice.

(App.125) These two letters demonstrate that Connors was aware that he would have a job with NationsCredit, but that he evaluated the economics of his decision and decided that retirement would be in his best financial interest. The retirement was "involuntary" only in that the difference between the two companies' retirement and benefits packages made retirement the clearly preferable option based on the financial repercussions of the decision.

Connors points to *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir.1996), to support his argument that summary judgment should not have been granted. The facts in *Aman*, however, are not comparable to the situation Connors faced. In *Aman*, the plaintiff left her job after being subjected to a "continuous pattern of discriminatory treatment over a period of years" which increased after the employee's attorney complained to the employer about the treatment. *Id.* at 1084–85. Connors concedes that any hostile work environment that had existed when he was CFO ended almost a year before he retired when he became Special Vice President. In addition, Connors stated that his resignation had nothing to do with Major being named CEO of NationsCredit.

The facts of this case are more similar to *Gray v. York Newspapers, Inc.*, 957 F.2d

---

**2.** In step two of *McDonnell Douglas*, the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action. *See Keller*, 130 F.3d at 1108.

At step three, the plaintiff can survive summary judgment only if he submits evidence

"from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (citations omitted).

1070 (3d Cir.1992), in which one of the plaintiffs brought a constructive discharge claim because her employer created a financially attractive early retirement program. *See id.* at 1080. The court found that the plaintiff had not established that the defendant "knowingly permitted" intolerable conditions such that a reasonable person would feel compelled to resign. *Id.* at 1082. Rather, the court found that, like Connors, the plaintiff had "deliberated her options carefully, and elected an early retirement package." *Id.* at 1082–83. Like Connors, Gray was not fleeing from a stick, she was reaching for a carrot.

Here, Connors weighed his options and concluded that working for NationsCredit and participating in its inferior benefits program were not reasonable financial alternatives to retirement from CFI. The decision to retire was likely disappointing for Connors because it was not the special severance package that he had hoped for when he took the position as Special Vice President and which he continued to pursue after accepting that position.

Connors also claims that he was constructively discharged because he was forced to choose between retirement or the prospect of unemployment because he had not received an explicit offer from NationsBank. As the district court correctly noted, "[t]he record cannot be reasonably, or even logically, read to support either a conclusion or an inference that Connors would have simply been unemployed had he not elected to retire from CFI." (Dist. Ct. at 16) It is clear from the record that Connors was aware that he would receive a job with NationsCredit and that he weighed his options carefully before deciding to retire from CFI. Connors admits receiving the two letters informing CFI employees that they would be offered jobs with Nation-

sCredit. In addition, in his retirement letter, he stated that he understood "that all CFI employees would be offered NationsCredit positions following the transfer."

Even assuming that he did not receive a definitive offer, Connors's constructive discharge claim still fails. The lack of a definitive offer did not cause conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign. His situation should be evaluated in relation to the 2000 other CFI employees. In *Gray*, we noted that an "employee is protected from a calculated effort to pressure her into resignation through the imposition of unreasonably harsh conditions, *in excess of those faced by her co-workers.*" *Id.* at 1083 (citation omitted) (emphasis added). Except for a few "key" executives, Connors received the same general offer of employment that every other employee of CFI received.[3]

Also, to the extent that the general offer of employment can be labeled ambiguous, Connors had a duty to attempt to clarify the situation before retiring. Connors did not try, and so he cannot rely on any ambiguity to support his constructive discharge claim. In *Gray*, we denied a co-plaintiff's claim that she was constructively discharged when she received no answer to her inquiry whether an imminent reduction in her hours would result in losing some benefits. We stated that "[i]t is unrealistic to expect that . . . an employee will make a decision of such magnitude as the decision to retire on the basis of such an assumption without further inquiry into the matter." *Gray,* 957 F.2d at 1086. Other cases have noted that, in most situations, a prerequisite to a successful constructive discharge claim is that the plaintiff attempted to explore alternatives before electing to resign. *See, e.g., Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3d Cir.1993).[4]

3. Connors points to the fact that these "key" executives were offered special employment contracts in anticipation of the takeover as direct evidence of age discrimination. The executives were given these contracts to ensure that they would continue to work at CFI during the transition period. If they were not offered a similar position by NationsCredit, CFI would be liable for sizeable severance payments. As part of the purchase agreement, NationsBank was required to give specific job offers so CFI would avoid any severance liability. Connors admitted that the understanding was that his new position would not be essential. Accordingly, Connors was not offered one of these contracts.

4. In addition, even before Connors received the two letters indicating that all CFI employees would receive offers from NationsCredit, he wrote a letter to Terry Ray, CFI's personnel manager, stating that while he knew that the agreement required the job offer, working for NationsCredit was "not an option" for him because he had "heard enough" to decide "even

Connors points to the treatment he received at the hands of Major, then CEO of CFI, to support his argument that he was forced into retirement. As the district court noted, any claim based on the treatment in 1991 is barred by the statute of limitation. Connors now attempts to use the treatment as "context" to support his claim that the decision to retire was involuntary. His own testimony contradicts this claim. Connors characterized his relationship with Major after he changed jobs in March 1992, as "affable" and "very good." App. at 357. In addition, Connors stated that his decision to retire had nothing to do with Major being named CEO of NationsCredit. His own statements rebut the argument that his relationship with Major influenced his decision to retire from CFI.

In *Gray*, we correctly stated that employees are not guaranteed stress-free environments and that discrimination laws "cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting." 957 F.2d at 1083 (citation omitted). Connors received the same employment offer as the 2000 other CFI employees, he knew that every employee would be offered a job, and he did not investigate to allay any concern that he would not be employed after the closing. Connors produced no evidence that could convince a reasonable jury that his decision to retire was anything but reasoned and voluntary.

We agree with the Fourth Circuit Court of Appeals in *Blistein v. St. John's College*, 74 F.3d 1459 (4th Cir.1996), wherein the court addressing an ADEA claim brought by a former employee who accepted a retirement package upon learning that the college was eliminating his position because of a budget shortfall, said,

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather, "[i]ntolerability ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,"—that is, whether he would have had no choice but to resign.

*Id.* at 1468 (citations omitted).

## IV.

■ As an alternative to making out a prima facie case with indirect evidence, a plaintiff may shift the evidence burden by producing direct evidence of discrimination. The plaintiff, however, faces a "high hurdle" if he wishes to do so. *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 513–14 (3d Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998). Under the standard announced by Justice O'Connor's controlling opinion in *Price Waterhouse v. Hopkins*, "the evidence must be such that it demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Id.* at 513 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1805, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)). To succeed, the direct evidence must be "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994).

■ We do not need to address Connors's claim that his direct evidence is sufficient to meet the "high hurdle." None of the proffered evidence changes the fact that Connors did not suffer an adverse employment action. To survive summary judgment, Connors needed to make an initial showing that NationsBank and Chrysler discriminated against him in hiring, discharge, compensation, term, conditions, or privileges of employment on the basis of his age. *See* 29 U.S.C. § 623(a)(1). Thus, Connors had to demonstrate that this direct evidence is in some

without having a specific benefits comparison." App. at 125. This letter demonstrates that, over a month before the closing, Connors had already decided not to work for NationsCredit. Because

his decision was already made, he had no reason to clarify the subsequent "indefinite" offers of employment, and their ambiguity did not affect him.

way linked to his decision to retire, the claimed adverse employment action. Connors has presented no evidence linking this evidence to his decision to retire. Indeed, since Connors did not know, when he retired, about much of the evidence, it could have had no bearing on his decision to retire. He claims that the district court "ignored" this evidence; however, it is more likely that the district court concluded, as we do, that this evidence had no bearing on his age discrimination claim.

## V.

From the record as a whole, giving favorable inference to Connors, there is simply not enough evidence to support age discrimination. In this case, there was no adverse employment action. Connors was given the same general offer of employment that every other employee at CFI was given. He elected not to take the offer for financial reasons. Although this may have been a difficult and stressful decision, as we are sure all resignation and retirement decisions are, this one was Connors's to make. He chose to retire from CFI rather than go to work for NationsCredit.

In sum, we hold that Connors did not produce enough evidence for a reasonable jury to find an adverse employment action, which is a prerequisite to a successful age discrimination claim. Accordingly, we will affirm.