

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-16-2007

# Embrico v. US Steel Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-5495

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Embrico v. US Steel Corp" (2007). *2007 Decisions.* Paper 583.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/583

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-5495

———

NICK EMBRICO, FRANK VITUCCI, and ROY WILLIAMS*,

*Appellants,*

v.

UNITED STATES STEEL CORP.

*(Pursuant to Court Order dated 11/27/06)

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 03-cv-5571)
District Judge:  Honorable Anita B. Brody

———

Argued July 9, 2007
Before: SLOVITER, HARDIMAN, and ROTH *Circuit Judges.*

(Filed: August 16, 2007)

Patrick J. McDonnell (Argued)
McDonnell & Associates
601 South Henderson Road
Suite 152
King of Prussia, PA 19406
        *Attorneys for* Appellants

Mary B. Taylor
Michael P. Duff
Kiley Clark

M. Cristina Sharp (Argued)
United States Steel Corporation
Law Department
600 Grant Street
U. S. Steel Tower, Room 1500
Pittsburgh, PA 15219

Daniel C. Moraglia
Bennett, Bricklin & Saltzburg
1601 Market Street
16th Floor
Philadelphia, PA 19103

*Attorneys for* Appellee

———

OPINION OF THE COURT

———

HARDIMAN, *Circuit Judge*.

This is an appeal from the District Court's grant of summary judgment in favor of United States Steel Corp. (U.S. Steel) and against Appellants Nick Embrico (Embrico), Frank Vitucci (Vitucci), and Roy Williams (Williams). Appellants are three former U.S. Steel managers who, after accepting a voluntary early retirement plan (VERP), brought claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, the Pennsylvania Human Relations Act, Pa. Stat. Ann. Tit. 43 §§ 951 *et seq.* (PHRA), and the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* (ERISA). Appellant Williams, an African-American, also brought claims of race discrimination in violation of the PHRA and Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e-5 (Title VII). Because we conclude that Appellants cannot meet the heavy burden of proving that they were constructively discharged, we will affirm.

## I.

"Our standard of review over the District Court's grant of summary judgment is plenary, and we apply the same standard that the District Court should have applied." *In re Color Tile Inc.,* 475 F.3d 508, 512 (3d Cir. 2007). "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Andreoli v. Gates,* 482 F.3d 641, 647 (3d Cir. 2007) (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). Under Rule 56 of the Federal Rules of Civil Procedure, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (citation omitted).

## II.

Because we write for the parties, and because the District Court provided a thorough recitation of the facts in its published opinion, *see Embrico v. U.S. Steel Corp.*, 404 F. Supp. 2d 802, 806-17 (E.D. Pa. 2005), we repeat only the facts essential to our decision. Appellants are former non-union managerial employees of U.S. Steel's Fairless Works (Fairless) in Bucks County, Pennsylvania. At the beginning of the 1990s, Fairless

operated a "Tin Line" and a "Galvanized Line," but U.S. Steel decided in the late 1990s to cease operating the Tin Line.

On August 2, 2001, Fairless Operating Manager Dennis Jones (Jones) prepared two documents in anticipation of a reduction-in-force (RIF) that he thought would follow the Tin Line shutdown. The first document listed operating and administrative positions that would need to be staffed on the Galvanized Line. The second document, which Jones characterized as a "roster" (Roster), consisted of two parts. The top half of the Roster was captioned "Galvanize Only Management Staff" and listed administrative positions with the names of one or two Fairless managers beside each position. The bottom half of the Roster, where all of Appellants' names appeared, was captioned "Others Not Included in Above."[1]

On August 14, 2001, U.S. Steel publicly announced its intention to close the Fairless Tin Line. Rather than lay off employees through a RIF, however, the company decided to offer its Fairless employees a VERP similar to one it had offered at its corporate headquarters in Pittsburgh. Because the Fairless VERP was open to all non-

---

[1] Although the Roster did not state the ages or races of any of those listed, beside the names of some of those on this "Not Included" half of the Roster were performance evaluations and handwritten notations. Next to Embrico's name was a performance rating of "5A" (*i.e.*, satisfactory) and the word "pension." Beside Williams's name was a rating of "6A" (*i.e.*, above average) and the word "transferable." Vitucci's name was matched to a rating of "4A" (*i.e.*, satisfactory) and the word "pension."

union employees aged 21 and over who had been working for the company for at least one year, all of the Appellants were eligible.

In mid-October 2001, U.S. Steel distributed written materials which itemized the pension benefits to which each employee was entitled, both with and without the VERP enhancement. Appellants' VERP enhancements were worth between $130,000 and $222,000 each. Other written materials that U.S. Steel distributed to the Fairless employees informed them that, "in the event that sufficient reductions are not attained through this [VERP], layoffs may result." *Embrico*, 404 F. Supp. 2d at 808. On November 8, 2001, U.S. Steel held two information sessions for employees to discuss the VERP during which it neither disclosed how many jobs would remain at Fairless after the shutdown, nor revealed the criteria that it would use should layoffs be required. Appellants and the other eligible employees had until November 30, 2001 to decide whether to take the VERP.

Although Appellants stood to receive substantial sums for retiring early under the VERP, initially they were unsure whether to accept it, or take their chances and hope to be offered positions at Fairless following the Tin Line shutdown. Appellants attempted to dispel some of their uncertainty with pointed inquiries about their prospects to U.S. Steel's upper management. Appellants' questions were met with noncommittal responses, however, which made them uneasy because upper management had given Appellants assurances of continued employment with the company and asked them about

5

their transfer preferences during prior downsizings at U.S. Steel. Appellants became even more convinced that their days with U.S. Steel were numbered when they learned that some of the other VERP-eligible Fairless managers had received private assurances that they would have jobs after the closure of the Tin Line. Ultimately, 43 of the 64 eligible employees — including all three Appellants — accepted the VERP.

III.

At the conclusion of extensive discovery, U.S. Steel moved for summary judgment arguing that Appellants had not created a triable issue that the company's implementation of the Fairless VERP amounted to a constructive discharge. For that reason, and because Appellants had not alleged any other adverse employment action, U.S. Steel contended that they could not state a *prima facie* case for any statutory violation. The District Court agreed with U.S. Steel, and set forth its reasons in a published opinion. *See Embrico*, 404 F. Supp. 2d at 818, 828-35. We agree with the District Court's opinion.

Disparate treatment claims brought under Title VII, the ADEA, the PHRA, and ERISA all are analyzed using the familiar three-step framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). At issue here is whether Appellants suffered an adverse employment action, which includes constructive discharge. *See Hill v. Borough of Kutztown,* 455 F.3d 225, 247 n.32 (3d Cir. 2006) (citation omitted). Appellants claim that U.S. Steel administered the VERP in such an unfair manner that they were constructively discharged.

"Constructive discharge occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *See Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006) (internal citation and quotation marks omitted). Stated another way, the plaintiff must show that the alleged discrimination goes beyond a "threshold of intolerable conditions." *Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 169 (3d Cir. 2001) (internal quotation marks omitted). "[I]ntolerability . . . is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign — that is, whether he would have had no choice but to resign." *Connors v. Chrysler Financial Corp.,* 160 F.3d 971, 976 (3d Cir. 1998) (citation, internal quotation marks, and alteration omitted). We apply this same standard to all of Appellants' claims. *See Gray v. New York Newspapers, Inc.*, 957 F.3d 1070, 1079 n.5 (3d Cir. 1992).

"[T]he use of an early retirement program to dismiss redundant or underperforming employees is not by itself" unlawfully discriminatory. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 732 (3d Cir. 1995) (citations omitted); *see also Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1422 (3d Cir. 1991). In the context of a forced retirement claim, the issue of voluntariness is the factor distinguishing a discharge from a mere early retirement. *See Baker v. Consolidated Rail Corp.,* 835 F. Supp. 846, 852 (W.D. Pa. 1993) (citing *Henn v. National Geographic Soc'y,* 819 F.2d 824, 828 (7th Cir. 1987)). To be considered voluntary, the decision to retire must be "informed, free from

7

fraud or misconduct, and made after due deliberation." *Baker*, 835 F. Supp. at 852; *see also Gray*, 957 F.2d at 1081.

Viewing the evidence in the light most favorable to Appellants, there is no triable issue of material fact to support their claim that their VERP elections were involuntary. A reasonable jury could conclude that upper management privately assured the Fairless managers listed on the top half of the Roster that they would still have jobs at the company following the Tin Line shutdown, and that none of the employees on the bottom half of the Roster received similar assurances.[2] The evidence also would permit a jury to find that U.S. Steel was aware that rumors of these selective assurances began to spread at Fairless and that Appellants learned of those rumors. Given the evidence that U.S. Steel had extended assurances of continued employment during VERPs which preceded prior downsizings, a jury could find that employees who did not receive assurances during the Fairless VERP rationally could assume that they were less likely to have jobs at the company in the event of a RIF than those who had received such assurances. Nevertheless, this evidence would not sustain a jury finding that U.S. Steel's

---

[2]     As the District Court noted, eight of the nineteen employees listed on the top half of the Roster — and thus, under Appellants' characterization of the evidence, pre-selected for retention — declined the VERP. *See Embrico*, 404 F. Supp. 2d at 811. Although this evidence seems to vitiate Appellants' contention that all of the managers on the top half of the Roster received private assurances of continued employment, we assume that the jury could find that these managers took the VERP notwithstanding any assurances they may have received.

8

administration of the Fairless VERP created conditions "so intolerable that a reasonable person subject to them would resign." *See Spencer,* 469 F.3d at 317 n. 4 (internal citation and quotation marks omitted). We reach this conclusion for several reasons.

First, although we recognize that a jury could find "misconduct" in the form of U.S. Steel's admitted deviation from its policy of refraining from communicating with members of its workforce who would have positions after any RIF that followed a VERP, *see Baker*, 835 F. Supp. at 852, the company's misconduct is only one "factor" in ascertaining the voluntariness of Appellants' decision to take the VERP. *See Gray*, 957 F.2d at 1085. Appellants' own theory of the case shows why U.S. Steel's violation of its company policy is not dispositive of this issue. Appellants complain that at least some of those listed on the top half of the Roster received assurances of continued post-VERP employment at the company, whereas none of those on the bottom half of the Roster received similar assurances. If U.S. Steel's misconduct had created "intolerable" working conditions, one would have expected *all* of those listed on the bottom half of the Roster to accept the VERP. In point of fact, however, five of those whose names appeared on the bottom half of the roster refused the VERP and two of those five were retained after the VERP. *See Embrico*, 404 F. Supp. 2d at 811. This evidence confirms that, although reasonable employees in Appellants' situation could have resigned — as Appellants did — a reasonable employee also could have taken his chances and waited to see how many colleagues accepted the VERP. The plausibility and indeterminacy of each of these

9

contingencies precludes Appellants from meeting their burden of showing that a reasonable person in their situation *would* resign. *See Spencer,* 469 F.3d at 317 n.4; *see also Gray*, 957 F.2d at 1082 ("the issue is whether the reasonable inferences from this record would allow a jury to infer that [Appellants] *would have been fired* (in violation of the ADEA) had [they] turned down the offer of early retirement.") (citation, internal quotation marks, and alterations omitted) (emphasis added).

Second, all Fairless employees on both sides of the Roster were given written materials which explained the VERP, set forth individualized estimates of the dollar amounts they could expect to receive with and without the VERP enhancement, and stated the possibility of layoffs if too few employees accepted the VERP. All Fairless employees were given the same amount of time — approximately six weeks — to consider the VERP. Thus, all VERP-eligible employees at Fairless "receive[d] information about what would happen in response to the choice" and had sufficient time to weigh their options. *See Gray*, 957 F.2d at 1081, 1085 (finding no triable issue that an employee was "bullied" into taking early retirement when she "contemplated the offer for some 45 days."). To the extent Appellants complain that they received less information than those assured of continued employment, we note that the relevant inquiry is not whether one employee received more information than another while considering a VERP, which reflects a state of affairs endemic to any such offer. Rather, the relevant question is whether Appellants received so little information that their decision to accept

10

the VERP was involuntary.  As we have explained, there is no genuine issue of material fact on this issue.

Finally, we cannot say that the choice posed by the Fairless VERP left Appellants between a rock and a hard place.  *See E.E.O.C. v. Westinghouse Elec. Corp.,* 925 F.2d 619, 634 (3d Cir. 1991) (noting that an "employer's offer of early retirement may create [a] *prima facie* case of age discrimination if it sufficiently alters [the] status quo [such] that each choice facing employee makes him worse off than he was before [the] offer") (citation omitted).  On this subject, we have explained:

> [W]e start by assuming that the employer is complying with the ADEA. Now the employer adds an offer of early retirement.  Provided the employee may decline the offer and keep working under lawful conditions, the offer makes him better off.  He has an additional option, one that may be (as it was here) worth a good deal of money.  He may retire, receive the value of the package, and either take a new job (increasing his income) or enjoy new leisure.  He also may elect to keep working and forfeit the package.  This may put him to a hard choice; he may think the offer too good to refuse; but it is not Don Corleone's 'Make him an offer he can't refuse.'  'Your money or your life?' calls for a choice, but each option makes the recipient of the offer worse off.  When one option makes the recipient better off, and the other is the status quo, then the offer is beneficial.  That the benefits may overwhelm the recipient and dictate the choice cannot be dispositive.  The question 'Would you prefer $100,000 to $50,000?' will elicit the same answer from everyone, but it does not on that account produce an 'involuntary' response.

*Gray*, 957 F.2d at 1080-81 (citation and ellipsis omitted) (quoting *Henn*, 819 F.2d at 826).

In the case at bar, we acknowledge that the "status quo" was not perpetual continued employment.  Rather, as of August 14, 2001 — the date the shutdown of the Tin Line

11

became public — the status quo was that Fairless soon would have more employees than jobs. Thus, by the time the VERP was announced in October 2001, Appellants had two options: accept early retirement with the VERP enhancement (and receive at least $130,000 apiece), or decline the VERP and continue to work in the same relative uncertainty — *i.e.*, the threat of a layoff under a RIF — that existed once the Tin Line shutdown had been announced in August. Appellants were not faced with a Hobson's choice.

In light of the implications of the Tin Line shutdown for the Fairless workforce, we have no doubt that Appellants' uncertainty about their future with U.S. Steel made their contemplation of the VERP difficult and stressful. But this state of affairs does not, as a matter of law, rise to the level of "intolerable" conditions resulting in constructive discharge. *See Duffy,* 265 F.3d at 170; *see also Gartman v. Gencorp Inc.*, 120 F.3d 127, 130 (8th Cir. 1997) (finding that a company did not create an intolerable condition by forcing an employee to choose between continuing to work in a plant "with an uncertain future" or "resigning"). As we have explained:

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather, "[i]ntolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,"— that is, whether he would have had no choice but to resign.

12

*Connors*, 160 F.3d at 976 (emphasis in original) (quoting *Blistein v. St. John's College,* 74 F.3d 1459, 1468 (4th Cir. 1996)).

In sum, Appellants have not created a triable issue that they were constructively discharged. We agree with the District Court's conclusion that Appellants' inability to establish an adverse employment action doomed all of their claims. *See Embrico*, 404 F. Supp. 2d at 818, 828, 832, 835. Accordingly, we will affirm the Order of the District Court.