**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1281
_____

PATRELL BARNETT,
                                        Appellant

v.

NEW JERSEY TRANSIT CORPORATION; NEW
JERSEY RAIL OPERATIONS, INC.; JOHN CALIA,
Locomotive Engineer; ALAN ZAHN, Senior Road
Foreman of Engines; NORMAN ALLEN, Locomotive
Engineer; MARK MATTIS, Senior Training Specialist;
GLEN EAGAN, Road Foreman of Engines
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 2-10-cv-03872)
District Judge: Honorable Esther Salas
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
August 1, 2014

Before:  HARDIMAN, NYGAARD and ROTH, Circuit Judges

(Filed: August 13, 2014)
_____

OPINION
_____

PER CURIAM

Appellant Patrell Barnett appeals from an order of the District Court granting summary judgment to the New Jersey Transit Corporation on her claim of discrimination. For the reasons that follow, we will affirm.

Barnett, an African-American woman, applied for the job of Locomotive Engineer Trainee for the New Jersey Transit Corporation ("NJT") after learning that NJT was looking to hire women and minorities. She was hired in October, 2007. The job was full-time and paid $24.00 per hour. At the time, Barnett was known as Patrell Hale. She met her future husband, Anthony Barnett, on the job; he also was a student in the Locomotive Engineer Trainee Program. The training program was approximately 18 months long and was designed to train students in all aspects of becoming a locomotive engineer for NJT. After an initial classroom period, students qualified on the various NJT rail lines by riding in the operating or head car and learning the physical characteristics of each line, for example, the braking points, signals, and landmarks. After qualifying on the lines, students were administered written and oral examinations on the physical characteristics and speed restrictions of each line; these tests were referred to as "PC exams." After passing all of the PC exams, students moved on to Level 2 of the program and actually drove the trains under the supervision of Instructor Engineers.

Barnett passed all of her written and oral PC exams for NJT's Southern Tier and moved on to Level 2 in June, 2008.[1] She had no problems with her operating assignments from June, 2008 through October 29, 2008. On October 27, Barnett worked with engineer Rebecca Brown. Barnett observed Brown's operation of the train for part of the trip, and operated the train herself for part of the trip, all without incident. On October 28, 2008, Barnett was scheduled to work under Instructor Engineer John Calia, a white male, on Train 62 from Port Jervis, New York to Hoboken, New Jersey. Calia, who described himself as "strict," suggested that Barnett simply observe him for a couple of days, and Barnett agreed. The first day went without incident and Barnett felt that Calia had been pleasant and helpful. Barnett spent 9 or 10 hours with Calia, and she operated the train during a portion of the trip.

When Barnett arrived the next day, October 29, she expected that it would go much the same as the day before. Instead, she was surprised to find that Alan Zahn, a Senior Road Foreman of Engines, and Norman Allen, another locomotive engineer, would be riding the train and observing her performance. Zahn had previously addressed her training class, where he expressed his view that "students are worthless and shouldn't be on the property," among other things.[2] Upon learning that she would be evaluated,

_____

[1] Our recitation of the facts is taken from the summary judgment record, which includes Barnett's two depositions, among many other items. We have viewed the facts in the light most favorable to Barnett as the non-moving party, and make all reasonable inferences in her favor. See Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).

[2] When Barnett deposed Zahn in the course of this litigation, she asked him if "being disdainful towards the students would help them in some way be better engineers?"

3

Barnett told Calia that she was not comfortable because of her lack of experience on this line, but Calia told her that it would not look good for her if she refused to operate the train. Barnett then operated the train. To her surprise, Calia assumed the role of an evaluator. He was chummy with Zahn and Allen, and generally "cold" toward her, in contrast to his friendliness the day before. After picking up passengers at a station stop, Barnett was supposed to pick up the conductor but was unsure about where to stop. Calia sarcastically said to her, "what are you gonna do, are you gonna leave the conductor?" Barnett was unnerved by Calia's sarcasm. After that, Calia, Zahn, and Allen engaged in a conversation in the operating car that did not involve Barnett, but which she could overhear. She heard someone refer to former NJT Executive Director Shirley DiLibero, as "that black bitch." Barnett became even more nervous. Shortly thereafter, she found herself going too fast as she approached the 40 m.p.h. speed restriction near the Otisville tunnel. She asked Calia for help in identifying the braking point, but he would not answer her, so she made the decision to apply the full-service brake, instead of applying less brake. As the speed of the train dropped to an inappropriately low level, Zahn yelled at Barnett, saying "what are you doing, little lady, you gotta get these people to Hoboken … you can't stop the train in the middle of the track."

The train was brought back up to speed and made it to Hoboken without further incident. At some disputed point, Barnett removed herself to the bathroom where she regained her composure and Calia operated the train. During the trip, Zahn gave Barnett

Deposition of Alan Zahn, N.T., at 37. Zahn replied that he had "a military background" and "was not out there to be friendly with students." Id.

4

a negative Student Engineer Skill Performance evaluation, criticizing her for, among other things, operating the train at improper speeds. He rated her performance as "poor," and stated that her knowledge was below average and that she lacked confidence. After Zahn and Allen exited the train, Calia asked Zahn if the individual who had previously qualified her was Dave Dubose, an African-American Road Foreman, insinuating, she thought, that he questioned whether she had been properly qualified on her PC exams.

That night, Barnett called Joey Gaskins, the Road Foreman on duty, and requested a different assignment. The next day, October 30, Barnett spoke to her supervisor, Mark Mattis, and told him that she did not want to work with Calia anymore. She also attempted to speak to Sean Dolan, the chief of the Hoboken Division. Barnett also confronted Calia, accusing him of insinuating the day before that Dubose had only qualified her because they are both African American, or because she "did something sexual for it." Ultimately, NJT arranged for Barnett's reassignment to a different instructor engineer.

Between the incidents on October 29 and October 30, and November 13, 2008, Barnett continued with her operating assignments as a full-time student engineer, without incident but with a different instructor. Meanwhile, Anthony Barnett was riding on Train 62 on October 29 in an effort to learn the physical characteristics of the line. He saw what happened to Patrell and he also complained on October 29 and 30 to various individuals about the incident. On November 13, 2008, Barnett and Anthony Barnett went together to NJT's Office of Equal Employment Opportunity and met with William Hemphill, the Director. The couple went to Hemphill after Anthony had failed two PC

5

exams in early November, and was going to be removed from the training program. The couple alleged that Anthony's exam failures were arbitrary and constituted retaliation for complaints they had made about the October 29 incident involving Patrell. As a result of this meeting, Anthony was given another opportunity to pass his PC exams. He took and passed the exams.

On November 18, 2008, Barnett was operating a train on the Pascack Valley line in Hackensack when a man stepped in front of the train and was killed through no fault of hers. Thereafter, she participated in the employee assistance program and eventually was cleared to return to work on or about November 22, 2008. After showing up for work, Barnett decided that she was not ready after all, and asked not to operate the train. Later that day, Senior Road Forman Engineer Glen Eagan asked to meet with her when she arrived at the Hoboken Terminal. Eagan, who had a big dog with him in his office, asked Barnett about the incident on the train on October 29, and she told him what had happened. Eagan then "started saying, well, you know, if you were given a chance to, to go through all this again, you wouldn't do it this way, right, you wouldn't say anything," and Barnett replied that, in fact, she would complain all over again because Calia, Zahn and Allen broke the rules when they distracted her and caused her to perform poorly on October 29. (Barnett Deposition, 6/14/11, N.T., at 201.) Eagan then said, "I can understand that because you know … if someone puts my back up against the wall and makes me uncomfortable, you know, I can get violent if I have to as well." Id. Barnett interpreted this latter remark as a personal threat. See id.

6

After November 22, Barnett took additional time off. She was cleared to return to work on or about December 8, 2008, but eventually resigned after seeing Eagan from a distance in the Hoboken Terminal and realizing that she was afraid of him. Barnett's only comment upon resignation was, "the job just wasn't for me." Soon thereafter, Barnett filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On July 30, 2010, Barnett filed a pro se complaint in the United States District Court for the District of New Jersey, alleging that she had been discriminated against by NJT on account her race and gender.[3] She filed an amended complaint, in which she included four claims under Title VII: (1) disparate treatment; (2) retaliation; (3) hostile work environment; and (4) constructive discharge. Anthony Barnett filed a separate Title VII action on the same day, at D.C. Civ. No. 10-cv-03871. The parties engaged in extensive discovery. Barnett was deposed twice, once in Anthony's case and once in her own. She testified that Eagan's threat was the primary reason why she resigned. (Barnett Deposition, 6/14/11, N.T., at 15.) Barnett deposed Alan Zahn and Mark Mattis. Following the close of discovery, NJT moved for summary judgment, Fed. R. Civ. Pro. 56(a). Barnett opposed the motion.

After holding argument on the motion, the District Court awarded summary judgment to NJT. The District Court held, in pertinent part, that no genuine issue of material fact existed with respect to whether Barnett had made out a prima facie claim of

---

[3] Barnett also sued five NJT employees individually. The District Court properly dismissed the claims against the individual defendants early in the litigation because there is no individual liability under Title VII. See Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1077 (3d Cir. 1996) (en banc).

race or gender discrimination, or claim of retaliation, because she did not suffer an adverse employment action, and because she did not rebut NJT's legitimate reason for giving her a negative skills performance evaluation relating to the October 29 incident. The District Court further held that the facts, when viewed in a light most favorable to Barnett, did not constitute a hostile work environment. Last, the District Court dismissed Barnett's constructive discharge claim for failure to exhaust administrative remedies because she did not include it in her EEOC complaint.

Barnett appeals pro se. We have jurisdiction under 28 U.S.C. § 1291. We review a District Court's grant of summary judgment de novo. See Alcoa, Inc. v. United States, 509 F.3d 173, 175 (3d Cir. 2007). We can affirm the District Court's grant of summary judgment on any basis supported by the summary judgment record. See Fairview Township v. U.S. Environmental Protection Agency, 773 F.2d 517, 524 n.15 (3d Cir. 1985). Summary judgment is proper where the summary judgment record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The moving party has the initial burden of identifying evidence that shows an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Accordingly, to defeat NJT's motion for summary judgment, Barnett was required to "designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories . . . sufficient to convince a reasonable fact finder to find all the

8

elements of [her] prima facie case." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 266 (3d Cir. 2007).

We will affirm. Title VII prohibits employment discrimination on the basis of race and gender. 42 U.S.C. § 2000e-2(a)(1). Three of the four issues raised by Barnett's civil action concern her decision to resign, and whether it was voluntary or the functional equivalent of a termination. We begin with her claim of disparate treatment. To prevail on a claim of discrimination, a plaintiff must first establish a prima facie case. A prima facie case of disparate treatment on the basis of race and/or gender requires that a plaintiff show the following: (1) she belongs to a protected class; (2) she suffered some form of adverse employment action; and (3) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

The District Court determined, and we agree, that there was no triable issue here with respect to whether Barnett suffered an adverse employment action either before she resigned or in the context of her resignation. Although "something less than a discharge could be an adverse employment action," a plaintiff must be able to point to a significant action, such as a demotion, involuntary transfer, or loss of other tangible benefits, in order to show that she was constructively discharged. See Jones v. School District of Philadelphia, 198 F.3d 403, 411-12 (3d Cir. 1999). An adverse or "tangible" employment action is "a significant change in employment status, such as hiring, firing,

9

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Barnett suffered no significant change in her employment status during the course of her employment with NJT. Although she received a negative performance evaluation from Zahn, she failed to show, or even allege, that it had any effect on her employment status. She was not fired from the training program, she was not demoted, and there was no change in her pay and benefits. Although Zahn marked her performance as "poor," there is no overlooking the fact that she effectively slowed the train's speed below the speed restriction of 40 m.p.h. and thus did not endanger the passengers. In short, Zahn's evaluation was not shown to have any short- or long-term consequences on Barnett's future with NJT, and thus was not an adverse action. Barnett concedes as much in her reply brief on appeal.

As to her decision to resign, Barnett argued that she had no choice because Eagan threatened her and she was afraid for her physical safety. We will find a "constructive" termination where an employer knowingly permitted conditions of discrimination so unpleasant that a reasonable person would have felt compelled to resign. See Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984). An employee is protected under federal anti-discrimination laws "from a calculated effort to pressure her into resignation through the imposition of unreasonably harsh conditions." Connors v. Chrysler Financial Corp., 160 F.3d 971, 975 (3d Cir. 1998) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992)). To support her claim of constructive termination, Barnett points to only one event which she interprets as

10

threatening.  In that incident, Eagan said, 'I can understand that because you know . . . if someone puts my back up against the wall and makes me uncomfortable, you know, I can get violent if I have to as well.'  Although this event might have been frightening to her, it would not have compelled a reasonable person to resign.  *See Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 169 (3d Cir. 2001).  The one incident Barnett alleges falls well short of the "intolerable conditions" and "unbearable" workplace she would need to prove for a constructive termination.  *See id.*"

In sum, because Barnett failed to show that she suffered an adverse employment action, NJT was entitled to summary judgment on her Title VII disparate treatment claim, without the need to also consider whether an adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination.  Barnett's retaliation claim fails for the same reason because it too requires a showing of an adverse employment action.  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in a protected activity under Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action.  See Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).  Barnett made several complaints about the events of October 29, and certain emails produced by NJT in discovery indicate that Calia and Zahn were immediately aware of the EEO implications of these complaints.[4]  Nevertheless, even if we assume

---

[4] An email that Alan Zahn sent to Roger F. Mannion on October 30, 2008 was produced in discovery.  In it, Zahn states his belief that based on their complaints to Gaskins and

that Barnett engaged in protected activity, her claim would still fail because there is no issue for trial concerning whether NJT took an adverse action against her. As we explained, Barnett suffered no long term consequences from her negative evaluation, and her decision to resign was voluntary.[5] Barnett argued that NJT fired Anthony Barnett, her future husband, but Barnett lacks standing to bring a discrimination claim on behalf of Anthony, and any adverse consequences which Anthony may have suffered as a result of reporting the October 29 incident are embodied in his retaliation claim.

To establish a prima facie case of a hostile work environment under Title VII, a plaintiff must show: (1) that she suffered intentional discrimination because of her membership in a protected class; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected her; (4) that the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of respondeat superior liability. See West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995). Barnett alleged that on October 29 she overheard supervisors calling a former African-American, female executive director of NJT a "black bitch." It distracted her enough that she lost her composure and failed to brake properly. Later, Calia hinted that she had been improperly qualified for Level 2 by an African-American male supervisor.

___

Calia, Barnett and Anthony Barnett should be referred to NJT's EEO office. Zahn's acknowledgement of the serious nature of the allegations and recommendation of referral to the office responsible for handling discrimination complaints tends to support an argument that Barnett was engaging in protected activity when she complained to her supervisors on October 29 and October 30.

[5] Barnett's freestanding constructive discharge claim also fails for this reason, whether or not she properly exhausted her administrative remedies.

Nevertheless, the racial and/or gender-related harassment alleged must be severe and pervasive in order to prevail on a claim of a hostile work environment. See Clark County School Dist. v. Breedon, 532 U.S. 268, 270-71 (2001) (per curiam). We agree with the District Court that the conduct alleged here – the conduct that was specifically related to race and gender – was insufficient, and that a reasonable jury could not conclude that it was severe and pervasive. Barnett attempted to bolster her case by citing various things, for example, that Zahn had a poor opinion of students; that her instructor (Calia) was sarcastic to her and behaved like an evaluator when she needed his help; that Mattis urged her to try to smooth things over with Calia; that NJT failed to investigate whether Calia, Zahn and Allen violated federal law when they engaged in distracting behavior in the operating car on October 29; that her evaluation on October 29 was suspiciously premature;[6] and that Eagan threatened her with violence, but she did not show, for summary judgment purposes, that these things had anything to do with race or gender. The hostility alleged must be race- or gender-based. See West, 45 F.3d at 753. See also Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-23 (1993).

For the foregoing reasons, we will affirm the District Court's order awarding summary judgment to NJT.

---

[6] We note that NJT established in discovery that Barnett was given a document titled "First Train Handling Instructions Review" that went over the rules and regulations for Level 2, including this rule: "Never exceed the MAS [Maximum Allowable Speed]. No reason is good and no reason will keep you in-service." The document also stated that: "Any time a supervisor is on your train, treat as a check ride." It was thus clear enough that Barnett would have to expect the unexpected in the course of learning to operate trains for NJT.